892 A.2d 781

DANIELLE VIKTOR, LTD., t/a Sterling Limousine, Appellee

v.

DEPARTMENT OF LABOR AND INDUSTRY, BUREAU OF EMPLOYER TAX OPERATIONS, Appellant.

Carmen Henderson, d/b/a Henderson Limousine Service, Appellee

v.

Department of Labor and Industry, Bureau of Employer Tax Operations, Appellant.

A Touch of Class Limousine Services, Inc., Appellee

v.

Department of Labor and Industry, Bureau of Employer Tax Operations, Appellant.

Champagne Limousine Service, Inc., Appellee

v.

Department of Labor and Industry, Bureau of Employer Tax Operations, Appellant.

Superior Limousine Service, Superior Transportation Services, Inc., Appellee

v.

Department of Labor and Industry, Bureau of Employer Tax Operations, Appellant.

Unique Limousine Service, Inc., t/a Unique Limousine, Appellee

v.

Department of Labor and Industry, Bureau of Employer Tax Operations, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 13, 2005.

Decided Feb. 28, 2006.

198

Jane Pomerantz, Harrisburg, for Dept. of Labor and Industry, Bureau of Employer Tax Operations, appellant.

Samuel WB Millinghausen, III, for Danielle Viktor, Ltd., appellee.

James Dennis Young, Cheryl Lynn Kovaly, Frank J. Lavery, Jr., Harrisburg, for Carmen Henderson, A Touch of Class Limousine Services, Inc., Champagne Limousine Service, Inc., and Superior Limousine Service, appellees.

Kelly Marie Knight, Harrisburg, for Unique Limousine Service, Inc., appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice NEWMAN.

In this case, we determine whether individuals who drive limousines (Drivers) for six limousine companies (Appellees) are independent contractors or employees pursuant to Section 43 P.S. § 753(*l*)(2)(B) of the Unemployment Compensation Law, 43 P.S. §§ 751–914. For the reasons that follow, we affirm the Orders of the Commonwealth Court that held that Drivers are independent contractors and, accordingly, that Appellant, the Department of Labor and Industry, Bureau of Employer Tax Operations (Department), erred by characterizing Drivers as employees and imposing unemployment compensation (UC) taxes on Appellees.

### FACTS AND PROCEDURAL HISTORY

Appellees are Danielle Viktor, Ltd., T/A Sterling Limousine (Viktor); Carmen Henderson, D/B/A Henderson Limousine Service (Henderson); A Touch of Class Limousine Services, Inc. (TOC); Champagne Limousine Service, Inc. (Champagne); Superior Limousine Service, Superior Transportation Services, Inc. (Superior); and Unique Limousine Service, Inc., T/A Unique Limousine (Unique).

The Commonwealth Court issued three separate Memorandum Opinions regarding the appeals, in each case reversing the decisions of the Department that characterized Drivers as employees and imposed UC taxes on Appellees. Judge McGinley authored the first Opinion, which addressed the appeals of the Henderson, TOC, Champagne, and Superior Appellees. *Henderson v. Dep't of Labor & Indus.*, No. 1894–1897 C.D.2003 (May 25, 2004) (Henderson Commonwealth Court Opinion). On that same day, Judge McGinley authored an Opinion regarding the appeal of Unique. *Unique Limousine Serv., Inc. v. Dep't of Labor & Indus.*, No.2028 C.D.2003 (May 25, 2004) (Unique Commonwealth Court Opinion). Judge Leadbetter wrote the third Commonwealth Court Opinion, which adjudicated the appeal of Viktor. She cited the conclusion of the Department that "[t]he record does not support a finding that limousine drivers *alone* suffer the risk of loss if expenses exceed income...." *Viktor v. Dep't of Labor & Indus.*, No. 1906 C.D. 2003 at 6, 2004 WL 2598999 at *2 (June 8, 2004) (Viktor Commonwealth Court Opinion). Judge Leadbetter labeled the reasoning of the Department "flawed," and held that the Department erred by imposing its own requirement that Drivers alone must bear the risk of loss if expenses exceed income to establish independent contractor status. On February 1, 2005, we granted allocatur and consolidated the appeals.

The Department assessed UC taxes against Appellees following its determinations that Appellees and Drivers had an employer/employee relationship during various periods between 1994 and 1998 and that Appellees failed to report all remuneration paid to Drivers as UC taxable wages.[1]

Appellees filed Petitions for Reassessment of the UC taxes, and hearings were held on behalf of each Appellee. The

1. Appellees were assessed varying amounts of UC taxes, along with penalties and interest in some cases. Viktor was assessed $2,755.91, plus $354.13 in interest and $299.89 in penalties (Reproduced Record (RR) at 65a); Henderson was assessed $438.88, plus $40.85 in interest (RR at 146a); TOC was assessed $17,279.06, plus interest in the amount of $2598.25 (RR at 274a); Champagne was assessed $3,100.37,

Department issued Final Decisions and Orders denying all of the Petitions.

The basis for the Decisions of the Department was that Appellees did not establish that Drivers were engaged in an independent trade, occupation, or business, thus failing to meet the second criterion of the two-prong test at 43 P.S. § 753(*l*)(2)(B), which provides, in pertinent part, that:

Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the [D]epartment that—**(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business [the "independence" prong].**

43 P.S. § 753(*l*)(2)(B) (emphasis added).

Subsection (a), the first prong of the test at Section 753(*l*)(2)(B), is not at issue in this case because it requires that the individual has been and will continue to be free from control or direction over the performance of such services both under his or her contract of service and in fact. The Department found that Drivers were free from such control and direction when providing their driving services for Appellees. However, the Department determined that Appellees did not establish that Drivers were customarily engaged in an independently established business because Drivers lacked a proprietary interest since they did not own, insure, or maintain the limousines that they drove.

Following the hearings, the Department made findings of fact and conclusions of law with respect to each Appellee.[2]

plus $851.06 in interest (RR at 384a); Superior was assessed $7,565.02, plus $1,133.22 in interest (RR at 457a); and Unique was assessed $36,963.66, plus interest in the amount of $6,803.29 (RR at 532a).

**2.** The general scenario regarding the provision of services through Drivers is essentially the same for each Appellee. The Department's

*Viktor*

Viktor provides limousine services pursuant to a license issued by the Public Utility Commission (PUC). Viktor engages Drivers to drive its limousines. The Drivers come to Viktor seeking work, and Viktor then performs a background check, as required by the PUC. Viktor describes itself as a "clearinghouse." RR at 36a.

Viktor owns and insures the vehicles, pursuant to PUC requirements. Clients contact Viktor to obtain services, and Viktor's dispatcher then calls Drivers from a list that it maintains to determine availability. Both the Drivers and Viktor obtain clients. Drivers for Viktor do not advertise their services; rather, they solicit business through use of business cards. A Driver who brings in his or her own client is paid a larger percentage of the resulting fee. RR at 35a. Drivers are paid a percentage of the fee charged to the client, and Viktor and Drivers determine these fees annually. Clients pay for gasoline, tolls, and parking fees. Viktor does not reimburse Drivers for expenses. Drivers pay for their own business cards, cell phones, advertising, clothing, home phones, and home offices, in the event that they operate an office from their home. If a Driver accepts an assignment from Victor that he or she cannot perform, Driver may chose a substitute to fulfill the assignment, and Driver is then obligated to pay that substitute on his or her own. RR at 36a, 38a. Additionally, Drivers are responsible for any damages done to the vehicles they drive, over and above normal maintenance. In the event of an accident, Drivers must pay the $1,000.00 deductible, as well as pay for necessary repairs that are not reimbursed by insurance. RR at 39a.

Drivers sign an agreement with Viktor on an annual basis and negotiate their rate of pay when the agreement is executed. However, Drivers may request to renegotiate these terms

factual findings are contained in the three unreported Commonwealth Court Opinions that are the subject of this appeal. With the exception of the specific time periods for which the Department sought UC taxes and the amounts imposed on each Appellee, the salient facts are, for the most part, similar in each case, and are summarized briefly for each Appellee in this section.

prior to the annual renewal date of the agreement. Drivers are paid per job, and they decide themselves when to turn their paperwork into Viktor. Some Drivers choose to turn their paperwork in once a month, and others submit it once a week. RR at 33a. Drivers are paid within one week of submitting that paperwork to Viktor. If Drivers obtain the client, they receive a larger percentage of the total fee. Drivers can accept or reject jobs without repercussions. Viktor does not train or supervise Drivers. Final Decision and Order of the Pennsylvania Department of Labor and Industry, July 22, 2003, Docket No. 98–R–0079–1 at 2–5 (Final Decision).[3]

A Driver who accepts an assignment is provided with the name and telephone number of the client, along with the date and time of the job, and then contacts the client directly to finish the arrangements. Clients determine the time and place of services. Viktor does not give Drivers directions or dictate routes of travel. After the job is complete, Drivers submit a trip ticket. *Id.*

A Driver who cannot perform a job that he or she has accepted is obligated to find a replacement driver and must pay the replacement driver directly. Drivers can hire assistants at their own expense. If a client pays a Driver in cash, that Driver keeps his or her portion of the fee and turns the balance over to Viktor.

Drivers are free to offer their services to others. If a client does not pay his or her bill, Drivers are not paid. Viktor treats Drivers as independent contractors. *Id.* The agreement is a standard form Independent Contractor Agreement that is supplied to Viktor by the National Limousine Association. RR at 33a. At the hearing, Viktor testified that it does not hear from Driver after a job is complete unless it has another assignment for Driver that Driver chooses to accept.

**3.** This document was included as an attachment at Appendix B–1 to the Brief of Appellant and was not contained in the Reproduced Record. The Final Decisions that the Department made regarding each of the other Appellees also were attached as Appendices to the Brief of Appellant and were not included in the Reproduced Record.

The Department found that Viktor did not meet the second criterion of Section 753(*l*) (2)(B) because there was no evidence that Drivers were engaged in an independent trade, occupation, or business. Accordingly, Drivers did not have a proprietary interest in a business. Further, the Department found that the record did not support a finding that Drivers "alone suffer a risk of loss if expenses exceed income since they do not own, maintain or insure the vehicles used to provide limousine services. Nominal expenses ... do not constitute risk of loss." Final Decision at 9.

The Commonwealth Court reversed, finding that the reasoning of the Department was "flawed." Viktor Commonwealth Court Opinion at 7. The court determined that a proprietary risk of financial loss, while suggestive of independent contractor status, is not a necessary element of the statutory standard. Similarly, the Commonwealth Court held that:

> ownership of all assets necessary to perform the service for which the customer pays, while suggestive of independent contractor status, is not a necessary part of the standard established by this court. A surgeon may need the facilities of an operating room and life support equipment to treat his patients, but that does not necessarily make him an employee of the hospital which owns them.

Viktor Commonwealth Court Opinion at 7, 2004 WL 2598999 at *4.

### *Henderson*

There are only slight variations in the facts found with respect to Henderson. These Drivers are free to extend services to clients beyond the agreed rental. If a client extends the rental time, the client pays Driver, and Driver turns the payment over to Henderson. Henderson's hourly rate varies depending on the type of vehicle used. Drivers are paid approximately twenty-five percent of the client's rate. Tips belong to Driver and are not kept by Henderson or shared with other Drivers. Customers pay for the limousine upfront, and if they exceed the number of hours for which

they have contracted, they pay the Driver directly. The Driver then turns that money over to Henderson. RR at 124a.

Henderson does not reimburse Drivers for the expenses they incur, which include the cost of suits Drivers must wear, gasoline, meals, business cards, replacement drivers used when they cannot perform an assignment, and cell phones and pagers. RR at 119a, 120a, 132a, 134a. When a customer does not tip a driver, Henderson does not reimburse the driver. RR at 121a.

Henderson issues 1099's to Drivers. There is a verbal agreement between Henderson and Drivers that Drivers are independent contractors. There is no requirement that Drivers call in to Henderson, and Drivers are free to reject any assignment, simply because they do not want it. RR at 117a, 135a. There are no ramifications for a Driver who refuses an assignment, and Henderson would still make future assignments available to that Driver. RR at 129a. Drivers file a Schedule C for income tax purposes. Henderson does not prohibit Drivers from offering their services to other companies. A Driver for Henderson testified that he uses his business cards as a form of printed advertising and does not rely on advertising to the general public with respect to his availability to drive limousines. RR at 134a, 138a. Final Decision and Order of the Department of Labor and Industry, July 22, 2003, Docket No. 97–R–0007–1 at 3–6 (Final Decision).

The Department found here, too, that the evidence failed to establish that Drivers were engaged in an independent trade, occupation, or business or that they had a proprietary interest in a business. The Department held that the fact that Drivers could offer their services to other companies was not sufficient to meet the burden required pursuant to the statutory test. Final Decision at 11.

The Commonwealth Court reversed this determination and held that Drivers "possessed the requisite proprietary interest associated with their services for hire" because: (1) they were

responsible for their own expenses; [4] (2) they were required to provide quality service to the client or risk the loss of gratuities; (3) if a client filed a complaint that resulted in a refund, Drivers were responsible to return half of the amount to the client; and (4) Drivers were responsible to provide error-free road service.[5]

## TOC

The Department made similar findings of fact in this case, as well. Drivers are not reimbursed for their expenses, which include the costs of suits that they are required to wear, cell phones, pagers, or meals on the road. RR at 247a–248a. Further, as was the case with Viktor, Drivers are responsible for paying the $1,000.00 insurance deductible for accidents that are their fault. If a refund is necessary or if a customer does not pay the fee, the Drivers are not compensated. RR at 250a.

TOC advises Drivers that the situation is one of self-employment. Many of its Drivers drive for other limousine companies. Some of its Drivers advertise their services using their own letterhead. Drivers are not required to give notice of their availability to TOC. Drivers are free to accept or reject assignments for any reason. RR at 245a. One TOC Driver testified that "I have the flexibility of either accepting

4. The Commonwealth Court specifically noted the following expenses that Drivers incurred with respect to services furnished to the various Appellees: (1) the cost of suits (Henderson); (2) gasoline (Henderson); (3) meals (Henderson); (4) replacement drivers hired by Drivers who cannot complete an accepted assignment (Henderson); (5) business cards (Henderson); (6) advertising (TOC); (7) $1,000.00 insurance deductible for accidents that are the fault of the driver (TOC); and (8) one-half of the amount of any refund given to a customer who has made a complaint (Superior).

5. Although Judge McGinley did not explain what "error free road service" meant, in the Opinion he wrote regarding the Unique appeal he provided further elucidation: "The Secretary found that 'Unique's insurance carrier will not cover Unique for any driver with more than two moving violations.'" Unique Commonwealth Court Opinion at 10 n. 5. Judge McGinley authored the Commonwealth Court Opinions in Henderson and Unique, and the same panel of judges decided both cases.

or declining jobs as to my particular availability or basically to my whim. If I like it or don't like it I can either accept it or decline it." RR at 261a. He also stated that "I just refuse it without any type of explanation." There are no negative consequences attached to such refusals. RR at 262a. Drivers may extend the rental time to a client at their own discretion if the limousine is not rented to someone else for that additional period. If the limousine has been rented to someone else for the requested period, Driver may extend his or her services through another limousine company. Drivers receive a flat fee of forty-five dollars for the first three hours of a job and then an hourly fee for any additional time. RR at 248a. They are paid by check every two weeks. RR at 254a. There is no set or expected number of hours per week that Drivers must meet. Tips belong exclusively to Drivers, and Drivers receive 1099's. TOC does not withhold taxes and does not provide any fringe benefits. TOC does not have written contracts with Drivers. TOC pays for gasoline and issues checks to Drivers every two weeks. Final Decision and Order of the Department of Labor and Industry, July 22, 2003, Docket No., 99–R–0004–1 at 3–6.

The Department made the same findings here that it did for Viktor and Henderson. Additionally, it found that neither the requirement that Drivers pay the $1,000.00 deductible in the case of an accident nor the ability of Drivers to work for other companies rose to the level of a proprietary interest in a business. Accordingly, the Department denied TOC's Petition for Reassessment,[6] and the Commonwealth Court reversed its decision, as it did with respect to the preceding Appellees.

### Champagne

The Vice–President of Champagne testified that Drivers are not required to be available at specific times to obtain work or driving jobs. RR at 346a. Even when a customer requests a

6. The Department did find, however, that one of the Drivers for TOC was an independent contractor, citing that he drove for three other companies, did business under a fictitious name, registered with the Department of State to provide his services, and listed business deductions that included the cost of his suits. *Id.* at 12.

specific driver, "[i]f the driver don't want the job, he don't take the job and we simply tell the customer that the driver is not available." RR at 351. Champagne pays Drivers on a weekly basis at an hourly rate of six dollars. RR at 356a, 375a. Champagne sets the rate for its six or eight hour packages and suggests a gratuity of sixteen percent, although that amount has increased to eighteen percent in some areas. RR at 357a. Not every job is part of a package; for example, a trip to an airport would involve a pre-determined rate. RR at 364a. The Vice–President noted that on numerous occasions when Drivers were not available, he or his wife had to drive the customer. RR at 347a.

The Department's findings were consistent with the ones it made for the preceding Appellees. Final Decision and Order of the Department of Labor and Industry, July 22, 2003, Docket No. 01–R–0011–1 at 1–10 (Final Decision).

The Commonwealth Court reversed the Department regarding Champagne.

## Superior

The Department's findings of facts regarding Superior do not differ materially from the ones it made with respect to the other Appellees. Superior advises prospective customers that the relationship between them and Driver is one between a contractor and a subcontractor.

At the hearing, a representative of Superior testified that no Drivers had ever indicated that they considered themselves employees rather than subcontractors. RR at 431a. This witness also stated that since 1990, the Internal Revenue Service had never challenged Superior's determination that the Drivers were independent contractors. RR at 438a. None of the Drivers had ever received any type of fringe benefit, such as health insurance, vacation, or pension, and none had ever requested any benefits. RR at 440a.

Prior to providing services, Superior has its Drivers execute an Independent Contractor Agreement that states, *inter alia,* that the subcontractor Drivers are responsible for their own

business and travel expenses. RR at 429a. Drivers are required to furnish their own attire and writing utensils necessary for record keeping. RR at 430a. They are not reimbursed for the cost of their meals, and they must pay for their own attire. RR at 436a. When customers are given refunds following complaints of poor service, Drivers share proportionately in that loss and are responsible for one-half of what Superior has to reimburse the clients. RR at 441a. If there is an accident, Drivers pay half of the amount of the deductible. *Id.* If a driver receives a traffic citation, he or she is responsible for paying for it, and if there is "an extraordinary occurrence" on the job, such as keys locked in the car, the driver must take care of the problem and is not reimbursed for any costs he or she incurs. *Id.* Superior provides the ice bucket, ice, glasses, and food in the limousine for the customers, and Drivers provide other amenities, such as newspapers and snacks on their own, with no reimbursement from Superior. *Id.* at 445a.

Drivers are not required to be available on a full-time basis or to perform work or any service on the premises of Superior. They do not have to work any set number of hours. RR at 436a. A Driver is prohibited from quitting in the middle of a job; however, Drivers do not have a continuing relationship with Superior. Drivers can and do provide services to other limousine companies, including competitors of Superior. Drivers advertise their services by word of mouth and by calling limousine companies to offer their services. Drivers are customarily paid fifteen percent of what the customer is charged, and they are paid on a weekly basis. They do not submit invoices. RR at 447a. Superior leaves the checks for Drivers in its garage, and when a Driver comes to do a job, he or she picks it up. RR at 449a. Drivers do not receive holiday bonuses. RR at 448. The President of Superior testified that Drivers advertise their services by calling him, by word of mouth, or with business cards. RR at 433a. He "never bothered to check" whether Drivers advertised in the yellow pages. RR at 448a.

Again, the Department determined that there was no evidence that Drivers had a proprietary interest in a business and that payment of half of the deductible in the case of an accident did not establish such an interest. Final Decision and Order of the Department of Labor and Industry, July 22, 2003, Docket No. 99–R–0005–1 at 3–7.

The Commonwealth Court reversed the Department regarding Superior.

### Unique

In addition to making similar findings of fact regarding Unique, the Department noted that Unique had employees who are not Drivers who are reported on quarterly UC tax returns. Unique has been in business for twenty or twenty-one years and has treated Drivers as independent subcontractors for that entire period. RR at 620a. Unique leases the vehicles provided to Drivers. Drivers do not need permission from Unique to take vacations or be otherwise absent, and Unique has no policy regarding holiday or vacation pay. RR at 622a. A Driver for Unique testified that he did not have to request permission from Unique before going on vacation. RR at 660a. The President of Unique testified that Drivers face no adverse consequences for turning down an opportunity to provide driving services. RR at 614a. Unique does not prepare a weekly or monthly work schedule for its Drivers. RR at 615a. Unique Drivers are not required to adhere to a dress code and they can and do provide services for other limousine companies. Another Driver testified that he did not advertise his services as he had never thought there was a need to do so. RR at 670a, 672a. Unique provides vehicle maintenance and pays for gas and oil. RR at 643a. Clients pay Unique for limousine services, and Drivers are paid regardless of whether Unique has been paid. The hourly charge to a customer for a sedan is fifty dollars and for a six-passenger limousine is seventy dollars. The hourly rate for an eight-passenger limousine is ninety-five dollars, and a fourteen-passenger van is sixty-five dollars. RR at 641a. Unique suggests that clients pay Drivers an eighteen percent gratuity.

Drivers are paid an hourly rate,[7] plus any gratuity. Drivers are responsible for the cost of their clothing and are not reimbursed for that expense. RR at 661a–662a. Unique pays Drivers by check every two weeks. RR at 648a.

At the hearing held regarding the Petition of Unique, the President of Unique testified that if a driver were supposed to do a pickup at an airport and never went, he or she would not be paid. RR at 621a. To illustrate, he stated that if a driver goes to the airport, and the flight has been cancelled, "[h]e's not getting paid for it. He didn't do anything." RR at 622a. The responsibility to confirm the flight is that of the driver. *Id.*

Unique's President also testified that he was the President of the Pennsylvania Livery Association (Association), which is a statewide organization that represents approximately three hundred limousine operators. RR at 624a. The Association maintains records that reflect that eighty-five to ninety percent of limousine companies in Pennsylvania treat their drivers as independent contractors rather than as employees. RR at 633a.

The Department concluded here, too, that Drivers did not hold a proprietary interest in a business and that their nominal expenses did not amount to a risk of loss. Final Decision and Order of the Department of Labor and Industry, August 12, 2003, Docket No. 02–R–0042–1 at 3–6 (Final Decision).

█ With respect to Unique's appeal, Judge McGinley authored a Memorandum Opinion reversing the Department and finding that Drivers did possess the requisite proprietary interest in a business necessary for independent contractor status. Factors supporting that conclusion were that: (1) Drivers were responsible for their own expenses;[8] (2) Drivers

7. It appears that the hourly rate is five dollars and fifty cents. The President of Unique testified first that Drivers are paid by the hour and then that they are paid by the trip. He stated that for an eighty-dollar trip, a Driver would receive eleven dollars, plus gratuity. RR at 653a. He noted that there was a formula used to determine at what rate the Drivers were paid. RR at 654a. Part of that formula included a rate of five dollars and fifty cents per hour, plus gratuity. *Id.*

8. Review of the record does not provide support for this finding. Unique pays for gas and oil and provides maintenance, insurance, and

were required to provide quality service to the client or risk the loss of gratuities; and (3) Drivers were required to provide error free road service.

## DISCUSSION

In the matters *sub judice,* we must determine whether, pursuant to subsection (b), the second prong of the test set forth at Section 753(*l*)(2)(B), the Commonwealth Court correctly concluded that Drivers were independent contractors as opposed to employees because they were customarily engaged in an "independently established trade, occupation, profession or business." 43 P.S. § 753(*l*)(2)(B). "As the issue for review is one of statutory interpretation, it is a question of law subject to plenary review by this Court." *U.S. Steel Corp. (USX Clairton Works) v. Unemployment Comp. Bd. of Review,* 579 Pa.618, 858 A.2d 91, 99 (2004). "[A] determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case." *Universal Am–Can, Ltd. v. W.C.A.B. (Minteer),* 563 Pa.480, 762 A.2d 328, 330–31 (2000). Based on our review of the facts of the instant cases, for the reasons that follow, we affirm the Orders of the Commonwealth Court.

There are two statutory criteria required to establish independent contractor status. The first, not at issue in the matter *sub judice,* involves the freedom of Drivers from control or direction over the performance of their work as limousine drivers.

licensing, as well. RR at 643a. Drivers are not charged for using the vehicles, and the passengers pay for tolls. Unique furnishes cell phones in the limousines, and pays for the service for those phones. RR at 644a–645a. Even Unique does not contend that Drivers are responsible for their own expenses. Rather, it reiterates that "the Commonwealth Court noted that the Drivers were responsible for their own expenses...." Nevertheless, Unique argues that Drivers did possess the requisite proprietary interest because "Drivers are equipped with, and provide, all the necessary tools to engage in their independent enterprise of providing driving services to [Appellees]." Brief of Appellee Unique at 13. These tools included an individual PUC license and the Drivers' own training, experience, and ability. *Id.*

The Department noted that "[a]s to whether an individual is free from direction and control not only with regard to the work done, but also with regard to the manner of performing it, we must look at the factors considered by the courts to determine control." Final Decision and Order of the Department of Labor and Industry, July 22, 2003, Docket No. 97–R–0007–1 at 7 (Final Decision) (citing *Pavalonis v. Unemployment Comp. Bd. of Review*, 57 Pa.Cmwlth. 289, 426 A.2d 215 (1981)).

As support for its determination that Drivers are free from control or direction over the performance of their work, the Department cited, *inter alia*, the following factors with respect to Appellee Henderson:[9] (1) prior to providing services, Drivers do not complete an application or participate in an interview; (2) Drivers may refuse a client or a trip; (3) the client and not Henderson determines the time, place, and destination of the trip; (4) Henderson does not tell Drivers what route to take; (5) Drivers do not report the progress of the trip to Henderson; (6) Henderson does not determine where or when Drivers make stops or where they may go; (7) Drivers are free to extend services to the client beyond the agreed rental; (8) Henderson does not provide any training to Drivers nor does it require Drivers to attend meetings; (9) Henderson does not supervise Drivers; and (10) Henderson does not provide a handbook or uniform to Drivers. Based upon these factors, the Department found that Henderson, and all other Appellees, as well, did not control or have the right to control Drivers. Final Decision at 8–9.

The Unemployment Compensation Law presumes that when individuals perform services for wages they are employees:

Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—

(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and

---

9. The Department used the same analysis and made similar findings and conclusions with respect to the other Appellees, as well.

(b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(*l*) (2)(B).

At issue in these matters is subsection (b), the second criterion, regarding whether or not Drivers were engaged in "an independently established trade, occupation, profession or business." 43 P.S. § 753(*l*)(2)(B). Subsection (b) addresses the mechanism through which a Driver furnishes his or her services to a limousine company, requiring that, for purposes of being an independent contractor, the worker must conduct his or her driving services as an "independently established" business.

The Department contends that the businesses of Drivers were not "independently established" trades because Drivers did not have a "proprietary" [10] interest in them. The Department reached this determination as the result of its reasoning that: (1) the fact that Drivers were free to offer their services to more than one company was insufficient to satisfy subsection (b); and (2) Drivers alone did not suffer the risk of loss if expenses exceeded income, since they did not own, insure, or maintain the limousines.

The Commonwealth Court adopted the Department's use of the "proprietary" interest terminology; however it reversed the Department and agreed with Appellees that Drivers did possess the requisite proprietary interest in their businesses, consistent with that court's earlier holdings in *Venango Newspapers v. Unemployment Compensation Board of Review*, 158 Pa.Cmwlth. 379, 631 A.2d 1384 (1993), and *Krum v. Unemployment Compensation Board of Review*, 689 A.2d 330 (Pa. Cmwlth.1997). The Commonwealth Court determined, *inter*

---

**10.** In each of its Final Decisions, the Department noted that with respect to the independence criterion, "an individual is customarily engaged in an independent trade or occupation where it is evident that he has a proprietary interest in same [sic] business which he can operate freely from the control of any other individual." Henderson Final Decision at 9–10; TOC Final Decision at 10; Champagne Final Decision at 9; Superior Final Decision at 9–10; Unique Final Decision at 9–10; and Viktor Final Decision at 8.

*alia,* that Drivers met subsection (b) because: (1) they were "capable of performing [their services] to anyone who wished to avail themselves of the services" and were not "compelled ... to look to only a single employer for the continuation of such services[,]" *Venango Newspapers,* 631 A.2d at 1388; (2) they were not dependent on Appellees for employment; and (3) they were hired on a job-to-job basis and could refuse any assignment. We affirm the Orders of the Commonwealth Court that reversed the determinations of the Department.

At the outset, we note the confusion created by the Department and the Commonwealth Court, in its Opinions in Henderson and Unique, with their use of the term "proprietary." [11] We are troubled by the emphasis that both the Department and the Commonwealth Court gave regarding a "proprietary" interest and by their view of what constitutes a proprietary interest sufficient to satisfy the independence criterion.

It is clear that with respect to every Appellee, the Department made the same conclusion that "[t]he record does not support a finding that limousine drivers alone suffer the risk of loss if expenses exceed income since they do not own, maintain or insure the vehicles used to provide limousine services." Brief of Appellant at Appendices B–1 at 9, B–2 at 11, B–3 at 12, B–4 at 9, B–5 at 12, B–6 at 10. The Department then concluded that the expenses that were identified in the record as being attributable to Drivers did not constitute risk of loss or the requisite "proprietary interest" necessary to establish independent contractor status.

Our concern with the use of this term arises from the fact that the statute neither includes nor defines "proprietary" with respect to establishing the exception to employment status. It appears to be a concept that, as applied by the

11. The Opinion authored by Judge Leadbetter regarding Viktor did not contribute to this confusion, for it properly articulated that "to the extent that some prior cases have considered a proprietary risk of financial loss as suggestive of independent contractor status, this is not a necessary element of the long-established standard." Viktor Commonwealth Court opinion at 6 (footnote omitted).

Department to Drivers, made it impossible for Drivers to establish that they were in business for themselves.

The Department argues that in order for Drivers to be considered independent contractors, the court must "determine if an individual has a proprietary interest in a business which can be operated without hindrance from another source" and that Drivers lacked such an interest. Brief of Appellant at 24. The Department analogizes the status of Drivers with that of research interviewers who were found to be employees because they had no place of business of their own or any capital invested. *Id.* at 29 (citing *Commonwealth v. Research, Inc.*, 9 Pa. D. & C.2d 445, 455–56 (Com.Pl.Dauphin County 1955)). The implication is that a worker has no proprietary interest in his business where he does not report to an office and where he has made no outlay of capital.

We reject this argument, along with the Department's findings that because Drivers had no such proprietary interest in their businesses, they were not independent contractors. The Henderson Commonwealth Court Opinion attempted to show that Drivers possessed a proprietary interest in their services warranting a finding that their work satisfied the independence criterion:

> (1) the [D]rivers were responsible for their own expenses; (2) the [D]rivers were required to provide quality service to the client or risk the loss of gratuities; (3) if a client filed a complaint that resulted in a refund the [D]rivers were responsible for one half of the amount returned to the client; and (4) the [D]rivers were responsible to provide error[-]free road service.

Henderson Commonwealth Court Opinion at 13–14.

However, this analysis and conclusion are not convincing, most particularly with respect to Unique, whose Drivers did not shoulder any expenses whatsoever. The Commonwealth Court did not distinguish between Unique's Drivers and those who provided driving services for the other Appellees, and the Department, too, did not differentiate among Appellees, instead making global findings that none of the Drivers pos-

sessed the requisite proprietary interest. The criteria set forth by the court regarding the loss of tips for poor service, sharing in refunds, and error free service are ones that are equally applicable to employment situations, as well.

With regard to the "proprietary" risk of financial loss, Judge Leadbetter used the proper analysis and made the appropriate conclusion:

> [T]o the extent that some prior cases have considered a proprietary risk of financial loss as suggestive of independent contractor status, this is not a necessary element of the long-established standard.... [T]he evidence ... belies any notion that the [D]rivers bear no material financial risk. Finally, to the extent that the [Department] intended to suggest that one cannot be an independent contractor unless he bears the **entire** financial risk associated with the enterprise at issue, this has no basis in law.
>
> ... **[T]he Department argues in its brief that the [D]rivers cannot be independent contractors because they do not own the vehicles they drive, or the PUC license necessary to transport passengers for hire. Again, ownership of all assets necessary to perform the service for which the customer pays, while suggestive of independent contractor status, is not a necessary part of the standard established by this court.**
>
> [H]aving found that both prongs of the established standard were met, the [Department] erred in imposing additional requirements and basing [its] decision solely on these.

Viktor Commonwealth Court at 6–8, 2004 WL 2598999 at **3–4 (internal footnote omitted) (emphasis added).

The Department invented and then applied its own criterion to determine what constitutes proprietary interest in a business, finding that because Drivers did not own, maintain, or insure the limousines, none of their other investments or expenses in their businesses could suffice to establish that their businesses satisfied subsection (b). There is no authority cited by the Department to support its opinion that a worker must bear on his or her own all of the risk and

expense of a venture in order to establish the independent nature of the business. In fact, based on the difficulties and expenses inherent in obtaining the requisite PUC license to provide limousine services in luxury vehicles, it is clear to us that the majority of individuals who provide driving services to limousine companies would lack the financial resources to own all of the assets of their businesses or bear all of the risks on their own.

The relevant word that we must analyze with respect to determining whether Drivers satisfied the second prong of the test is "independent." The rules of statutory construction mandate that "[w]ords and phrases shall be construed according to ... their common and approved usage...." 1 Pa.C.S. § 1903(a). It is the word "independently" that engenders the instant dispute between the parties, so we start by reviewing its meaning. Webster's Third New International Dictionary defines "independent" as, *inter alia:*

> not dependent: as ... not subject to control by others: not subordinate: self-governing, autonomous, free ... not affiliated with or integrated into a larger controlling unit (as a business unit) ... not requiring or relying on something else (as for existence, operation, efficiency).

*Webster's Third New International Dictionary* 1148 (1986).

"Dependent" is defined as, *inter alia,* "unable to exist, sustain oneself, or act suitably or normally without the assistance or direction of another ...: connected in a subordinate relationship: subject to the jurisdiction of another." *Id.* at 604.

Evidence of record showed that the business of Drivers was not subject to the control of Appellees, was not a business unit or other component of the business of Appellees, and was not connected in a subordinate manner to any of the Appellee companies. Appellees were clients of Drivers, but Drivers did not depend on Appellees for their existence, operation, or efficiency. If any one of the Appellees were to cease conducting business, or to decide not to contract with Drivers, Drivers would not be out of employment. Drivers were free to

perform their services for any other limousine company and were not compelled to look to the existence of any one Appellee for continuation of their ability to provide driving services. *See Applied Measurement Prof'ls, Inc. v. Unemployment Comp. Bd. of Review*, 844 A.2d 632 (Pa.Cmwlth. 2004) (holding that an exam proctor who performed proctoring services for a client of Applied Measurement Professionals, Inc. (AMP) was not an AMP employee where AMP provided no training to her, was not present when she performed her services, did not supervise her performance or provide her with supplies, paid her by the job, provided no benefits, and reported her earnings to the IRS on a 1099 form rather than a W–2 form).

 The Department correctly cites the remedial purpose of the Unemployment Compensation Law that "requires the term 'employment' to be broadly construed to provide for the largest possible coverage of employees[.]" Brief of Appellant at 26. We articulated this important principle in *Department of Labor and Industry v. Aluminum Cooking Utensil Co.*, 368 Pa. 276, 82 A.2d 897, 898–99 (1951), where we stated:

> Having in mind the broad purposes of this unemployment compensation legislation as expressed in the preamble to the act, it is our opinion that it was the intention of the legislature to provide for a larger coverage of employes entitled to unemployment compensation than merely those who would be considered employes under the common law, and to include, as it expressly states, 'all service performed * * * for remuneration', subject only to the exceptions specified in other provisions of the act hereinafter referred to.

However, the Department's argument that this broad purpose mandates that we find that Drivers are employees, rings hollow in the instant case for two reasons: (1) Drivers themselves do not claim that they are employees who are entitled to unemployment compensation benefits;[12] and (2) the very

12. None of the Drivers for Superior had ever filed either a workers' compensation or UC claim asserting that he or she was an employee of

language that the Department cites in *Aluminum* recognizes the exclusion from coverage that is the basis of this litigation.

The determinations of the Commonwealth Court regarding Drivers' status were consistent with our holdings in *Aluminum* and in *Commonwealth v. Hecker and Co.*, 409 Pa. 117, 185 A.2d 549 (1962). Although the Department argues that in order to be an independent contractor, a worker cannot have any dependence whatsoever on another entity, our cases do not support that proposition.

In *Aluminum*, we considered whether distributors, junior dealers, and field dealers of Aluminum's products were customarily engaged in an independently established trade or business. We determined that these individuals were independent contractors, even though the bulk of their work involved their handling the products of Aluminum:

> As to (c), the third of the conditions-that the individual be customarily engaged in an independently established occupation or business-it appears that the distributors, junior dealers and field dealers may sell merchandise other than the Company's products, even products of the Company's competitors, and a number of them do in fact sell competitive products.[13] They operate their business without hindrance from any source whatever and entirely free from control. **While working for the Company they can and do engage in similar work for others; their occupations are not confined to, nor 'established' only for, the performance of the Company's work, and, while no doubt the major part of their business is in handling the**

Superior. RR at 440a. Nor had any of TOC's Drivers ever filed a workers' compensation claim asserting that TOC was his or her employer. RR at 249a. The record does not have any evidence regarding the other Appellees to suggest that those who drove for them filed workers' compensation or UC claims asserting employment status.

13. At the time of our decision in *Aluminum,* there was a three-prong test for determining independent contractor status; however, the language in the statute today is the same as that of subsections (a) and (c) that were the subject of *Aluminum.* The three-prong test was replaced by the two-prong test by the Act of May 23, 1949, P.L. 1738.

Company's products, it is not the sole part. The third condition is therefore also met by the Company.

*Aluminum*, 82 A.2d at 899–900 (emphasis added).

When this Court later referred in *Hecker* to the workers in *Aluminum*, we noted that they "could sell the products at any price they desired and that they were constantly selling the products of several competitors at the same time. Their continued employment was thus not dependent on the particular taxpayer involved in that case...." *Hecker*, 185 A.2d at 553.[11] As indicated by the Final Decisions of the Department, Drivers could have offered or did offer their services to others. The businesses of Drivers were not established only for the purpose of the work of a particular taxpayer.

The Department argues to this Court that the Commonwealth Court determinations relied on only one criterion to establish that Drivers were independent contractors pursuant to the terms of the statute, which was that **"they can work for more than one employer."** Brief of Appellant at 23 (emphasis supplied). The Department asserts that if we adopt this rationale, it will mean that almost every worker could qualify as an independent contractor.

This is not true; the Department has mischaracterized the holdings of the Commonwealth Court, which did not rely solely on one factor in making its determination of indepen-

14. In *Hecker*, we reached the opposite conclusion, finding that registered representatives who were licensed to sell securities on behalf of an investment company were employees, rather than independent contractors. In that case, the company provided the workers with desks in its office, business cards, advertising materials in the name of the company, clerical and secretarial services, statistical and market analyses critical to the conduct of business, use of telephones and other office supplies. *Hecker*, 185 A.2d at 551. There were two factors that were essential to our determination in *Hecker:* (1) registered representatives were required to have all orders approved by the company; and (2) because the Pennsylvania Securities Act prohibited a registered representative from conducting his or her own business of selling securities, a worker could not be considered to be "in business for himself[.]" Accordingly, the registered representative could not meet subsection (b) of the statute. *Id.* at 553. These factors stand in direct contrast to the scenario with respect to Drivers who did not require approval from Appellees regarding their job performance and who were not subject to a statutory prohibition regarding their driving services.

dent contractor status. Instead, the Commonwealth Court predicated its decision regarding the independent contractor status of Drivers for Appellees Henderson, TOC, Champagne, Superior, and Unique on the reasoning in its earlier decisions in *Venango Newspapers v. Unemployment Compensation Board of Review,* 158 Pa.Cmwlth. 379, 631 A.2d 1384 (1993), and *Krum v. Unemployment Compensation Board of Review,* 689 A.2d 330 (Pa.Cmwlth.1997).

In *Venango Newspapers,* the Commonwealth Court cited the ability to work for more than one enterprise as an "important factor [ ]" in determining independent contractor status pursuant to Section 4($l$)(2)(B); however, it did not state that it was **the only** factor. *Venango Newspapers,* 631 A.2d at 1388. The court also cited its decision in *Krum,* which held that an attorney who did work for Assigned Counsel, an agency that matched attorneys with clients seeking counsel to perform particular legal assignments, was an independent contractor, as opposed to an employee of the firm. *Krum, supra.* Although the facts in *Krum* involved legal services as opposed to limousine services, the scenario in that matter shared notable similarities with the one *sub judice,* including that "Krum could refuse assignments and remained capable of performing services for anyone." *Id.* at 333.

The record in the instant matter indicated that Drivers could select what assignments they wanted to accept or reject, in the same way that Krum could. This factor supports the finding that Drivers were engaged in their own independently established businesses. At the Henderson hearing, a Driver testified that he is neither required nor expected to call in to Henderson at any time with respect to his availability. RR at 128a. It is difficult to fathom a situation where someone other than an individual engaged in his or her own business would possess the unmitigated prerogative to accept or reject assignments at will, to work only when he or she chose to, to substitute other workers of his or her choice when he or she chose not to complete an assignment, and to perform the services however he or she saw fit to do so.[15]

15. We note that the unfettered ability to accept or reject assignments also relates to the first criterion in the statute at subsection (a) regard-

The Commonwealth Court did not rest its determinations solely on the fact that Drivers were free to work for more than one company. The court considered the facts that Drivers were hired on a job-to-job basis, could refuse any assignment, and were not dependent on Appellees for ongoing employment. Henderson Commonwealth Court Opinion at 13. Further, the court also specifically determined that Drivers suffered a risk of loss if expenses exceeded income, for the evidence suggested that they bore a material financial risk, and the Department's requirement that they alone must bear the risk of loss "has no basis in law." Viktor Commonwealth Court Opinion at 6–7, 2004 WL 2598999 at *3.

The Department argues that the Commonwealth Court, in finding that Drivers were engaged in independently established businesses, ignored our holdings in *Aluminum* and *Hecker*. The Department maintains that the question "is whether the worker can be considered to be in business for himself [ ]" and that pursuant to *Aluminum* and *Hecker*, Drivers are not. Brief of Appellant at 28. According to the Department, if a worker has any type of dependence on some other entity, then the worker cannot be characterized as an independent contractor. We find this argument unsupported.

■ In *Hecker*, the court held that one cannot be "customarily engaged in an independently established trade, occupation, profession or business" where "he is dependent upon another for the continuance of his employment and thus becomes unemployed through no fault of his own." *Hecker*, 185 A.2d at 552. It is true, as the Department posits, that a worker can be considered an independent contractor only if he or she is in business for himself or herself

The Department has cited two opinions from courts in other states that have held that limousine drivers were employees.

ing the freedom from control or direction over the performance of services. However, the control and direction over performance discussed at that criterion addresses the situation where the worker has accepted a job and the individual, once engaged in the work, is free of direction or control in its implementation.

.

However, those cases are not dispositive and are distinguishable from the ones before us.

In *O'Hare–Midway Limousine Service, Inc. v. Bd. of Review of the Department of Employment Security*, 232 Ill. App.3d 108, 173 Ill.Dec. 171, 596 N.E.2d 795 (1992), the court did consider the limousine drivers to be employees, as opposed to independent contractors, pursuant to the Illinois State Unemployment Compensation Law. However, the court based its decision on the fact that O'Hare–Midway controlled the actions of the drivers, not on the fact that the drivers were not in business for themselves:

> Although there is no Illinois case law concerning the specific issue of whether limousine drivers are employees for unemployment insurance purposes, the Seventh Circuit Court of Appeals has decided this very same issue involving O'Hare–Midway. (See *NLRB v. O'Hare–Midway Limousine Service, Inc.* (7th Cir.1991), 924 F.2d 692). In its decision, the Seventh Circuit found that the issue centered on O'Hare–Midway's ability to control the employees noting the rules regarding collection of fares and servicing of passengers, and the mandatory dress code. Similarly, in the case at bar, we find that the chauffeurs were not free from O'Hare–Midway's general control.

*O'Hare–Midway*, 596 N.E.2d at 798. The parties in the cases before us agree that the issue of control is not in question here.

The Department also cites *Koontz Aviation, Inc. v. Labor and Indus. Relations Comm'n*, 650 S.W.2d 331 (Mo.App.1983), as support for its position that Drivers were not engaged in an independent business. However, this argument is not persuasive because the *Koontz Aviation* case involved the Missouri state statute, which differs significantly from the Pennsylvania UC statute. The Missouri statute provides that the term "employment" includes:

> service performed for wages as an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other

than milk), or laundry or dry-cleaning services, for his or her principal; or as a traveling or city salesman, other than as an agent-driver or commission-driver . . . .

V.A.M.S. § 288.034(6). The court in *Koontz Aviation* was charged with determining whether certain commissioned limousine drivers were included within the definition although they were not specifically listed in the statute's delineation of commissioned drivers. Pennsylvania's UC statute has no such provision, and the facts in *Koontz Aviation,* notwithstanding the specific statutory provision, are radically distinguishable.

Further, we are aware of another case that held that drivers were employees rather than independent contractors. A recent California trial court decision determined that Fed Ex Ground drivers were employees of Fed Ex Ground (Fed Ex) rather than independent contractors, based on the level of control that Fed Ex asserted on them and the absence of an entrepreneurial business on the part of those drivers. In *Estrada v. Fed Ex Ground,* Cal. Superior Ct., Los Angeles, BC 210130 (July 26, 2004), the court analyzed whether delivery drivers were independent contractors or employees of Fed Ex. The court addressed the two criteria of control and conduct of an independent business in reaching its determination that those drivers were employees. Despite contractual terms articulating that the relationship between a driver and Fed Ex was that of independent contractor, the court found that "[Fed Ex] not only has the right to control, but has close to absolute actual control over the [drivers] based upon interpretation and obfuscation." *Estrada* at 4. The drivers in that case were "engaged in the exclusive and full time pick up and delivery service for [Fed Ex] and are indentified [sic] as such. [Fed Ex] also provides business cards for the [drivers] with its logo." *Id.* at 16.

This scenario, too, differs from the facts in the matters *sub judice,* where Drivers are free to accept and reject assignments, work for competitors of Appellees, and determine their own schedules based on the jobs they choose to accept. The court in *Estrada* described how the Fed Ex drivers were "totally integrated into the [Fed Ex] operation . . . and are to

foster the professional image and good reputation of [Fed Ex]." *Id.* at 15. The total integration noted by the trial court reflects both the level of control exercised by Fed Ex and the absence of an independent business operated by those driving for that company. The Fed Ex drivers " 'had little or no entrepreneurial opportunities' and the 'economic value of the [drivers'] contract' is that it is in effect a 'job.' " *Id.* at 19. Further, the court pointed out although the drivers had the opportunity to purchase additional routes that would result in the ability to make a profit, they needed the permission of Fed Ex to do so, and that possibility did not confer any entrepreneurial aspect on them. *Id.* at 20. The holding in *Estrada* that the Fed Ex drivers are employees is predicated on facts that are distinguishable from the ones before us, where Drivers provide their services to any limousine company they choose, on their own terms, and do not operate to promote the business of any one company.

The Department contends that Drivers were not in business for themselves as discussed in *Hecker* because they lacked a "proprietary" interest in their businesses. At the hearing regarding Viktor's Petition for Reassessment, a representative of the Department testified that Drivers did not meet subsection (b) because "[o]ne of the other things [in addition to advertising] is, owning cars and having a financial interest. If you owned a business, you have expenses, you have equipment. . . . " RR at 21a.

We reject this argument. While there may be some businesses that cannot be operated independently without owning all of the assets or advertising, the business of providing driving services to limousine companies is not one of them. This principle is consistent with our holding in *Aluminum*, where workers who sold the products of one company predominantly but were free to sell merchandise of the company's competitors, were engaged in an independently established business, despite the fact that the major part of their operations involved the products of their major supplier. This Court did not use the word "proprietary" in that Opinion or impose any requirement that workers there own the aluminum

utensils they were selling or be totally free of any degree of dependence on the supplier. The Commonwealth Court reached the same result in *Venango Newspapers*, by finding that newspaper delivery persons were engaged in an independently established business despite the fact that they were "dependent" on the existence of newspapers in order for them to have a delivery business. As the Commonwealth Court noted in that case, "[workers] admitted that they were free to perform delivery services for anyone who wished to contract with them-even competitors of Venango. In addition, the business of delivering newspapers or anything else is, by its very nature, not limited to a single employer." *Venango Newspapers*, 631 A.2d at 1388.

In *Hecker*, where we concluded that workers were employees, we did not use the word "proprietary" in our analysis, and we reiterated the difference between the registered representatives there and the workers in *Aluminum:*

> The position of the registered representative is quite different from that of the 'distributors' held to satisfy subsection (B) by this court in Aluminum Cooking Utensil, supra. We found there that the individuals in question could sell the products at any price they desired and that they were constantly selling the products of several competitors at the same time. Their continued employment was thus not dependent on the particular taxpayer involved in that case, as is true with the registered representatives and appellant.

*Hecker*, 185 A.2d at 553. It is clear that a critical element of our determination of employment status in *Hecker* was the fact that the workers' continued employment was dependent on one particular taxpayer.

■ As Judge Leadbetter noted, the ownership of the assets of the enterprise, although not a definitive factor, may be relevant to determining independent contractor status. In the matters *sub judice*, the Department did not acknowledge the fact that Appellees hold the PUC licenses and own the limousines because of the realities involved in having the Drivers procure a license. Most Drivers would be unable to obtain the necessary PUC license to operate a limousine

service on their own. TOC's president testified that it could cost up to $18,000.00 to get a PUC license and that the process of getting one was "particularly involved." RR at 254a–55a. He further stated that there was a $350.00 application fee, "exuberant" [sic] legal fees, required notice publication in the Pennsylvania Bulletin with the opportunity for protest, the requirement to show need and financial background, and a period of two and a half to three years until there is a final decision. RR at 255a–56a.

Appellees correctly advise that Drivers:

could not readily operate common carrier businesses for hire, even if they wanted to. In order to carry passengers for hire in a luxury vehicle, an individual must apply for an [sic] obtain a[PUC] license, purchase livery insurance, obtain luxury vehicles as approved by the [PUC], obtain specialized vehicle tags, and submit rate tariffs for approval by the [PUC]. These conditions precedent to operating a limousine company essentially preclude the average individual from having a proprietary interest in a separate business in the industry.

Brief of Appellees Henderson, TOC, Champagne, and Superior at 32.

It is clear that the Department gave great weight to the fact that Drivers did not own the limousines, while failing to acknowledge that Drivers possessed the tools necessary to perform driving services for the limousine companies who were their clients. In assessing the unique facts of this case, the Commonwealth Court correctly reversed the Decisions of the Department.

## CONCLUSION

Because Drivers meet both prongs of the test set forth at 43 P.S. § 753($l$)(2)(B), we affirm the Orders of the Commonwealth Court, which held that the Department erred by finding that Drivers were employees and by imposing UC taxes on Appellees. The Department wrongly imposed its own interpretation of what constitutes an "independently established

trade, occupation, profession or business" in contravention of the dictates of the statute and the interpretations of this Court. The emphasis of the Department on the "proprietary" interest factor, as measured by ownership of assets or bearing some undefined share of the risk of loss, is not supported by the statute and impaired the Department's ability to assess the nature of the Drivers' businesses. The Commonwealth Court arrived at the correct determinations, and appropriately relied on its holdings in *Venango* and *Krum.* However, we reject that part of the reasoning of the Commonwealth Court that established some universal requirement to find a "proprietary" interest based on ownership of assets or sharing in risk in order to meet the independence criterion of the statute.

 Neither the statute nor this Court requires an independent contractor to own all of the assets of his or her business or to bear on his or her own the full measure of financial risk of the enterprise. Rather, the unique facts of each case must be examined in order to resolve the question of employee versus independent contractor status. *Universal Am–Can, Ltd. v. W.C.A.B. (Minteer),* 563 Pa.480, 762 A.2d 328, 330–31 (2000).

In the matters before us, Drivers call Appellees when they want work or, in the alternative, are called by Appellees when work is available. Drivers provide their services to Appellees, on a job-to-job basis with no continuing relationship beyond each assignment, and each assignment is taken or rejected strictly at the Driver's prerogative. Given the fluidity of these arrangements, we would be hard-pressed to determine how Drivers could ever become "unemployed," when they work at their own volition for many companies and only at those times when they choose to do so.

The record supports the holdings of the Commonwealth Court that Appellees demonstrated that Drivers met subsection (b), for several reasons, including: (1) the Drivers' ability to perform their services for more than one entity, including competitors, with no adverse consequences; (2) the operation of their businesses and their ability to perform work did not

depend on the existence of any one of the Appellees; and (3) the fact that Drivers bring all necessary perquisites of providing driving services to limousine companies, even though they do not own the limousines or bear all of the financial risk.

Drivers possess the requisite interest and tools of their trade necessary for the conduct of the business of providing driving services to limousine companies, including their licenses to drive, training, experience, and ability. The fact that Appellees, rather than Drivers, own the limousines because of the realities involved in satisfying PUC requirements does not diminish the fact that Drivers are engaged in their independently established businesses.

Accordingly, we affirm the Orders of the Commonwealth Court.

Chief Justice CAPPY and Justice CASTILLE, SAYLOR, EAKIN and BAER join the opinion.

Former Justice NIGRO did not participate in the decision of this case.