IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeremy Robinson, t/d/b/a PSU : 
KnowHow, : 
                     Petitioner : 
                           : 
         v. : 
                           : 
Department of Labor and Industry, : 
Office of Unemployment Tax : 
Services, : No. 1711 C.D. 2015
                 Respondent : Argued: March 7, 2016

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI           FILED: March 31, 2016

       Jeremy Robinson, trading and doing business as PSU KnowHow (Petitioner), petitions for review of an order of the Department of Labor and Industry (Department) denying its petition for reassessment regarding unemployment compensation contributions and interest on the basis that from 2009–2013, Petitioner qualified as an "employer" for purposes of the

Unemployment Compensation Law (Law).[1]  For the reasons that follow, we affirm the Department's order.

## I.

In July 2013, the Office of Unemployment Compensation Tax Services (Office) filed a notice of assessment against Petitioner, a private tutoring company owned by Mr. Robinson, assessing a total of $83,481.00 in unemployment contributions and interest owing with regard to employees Petitioner engaged from 2009–2013.  Petitioner then filed a petition for reassessment (petition), asserting that the Office erred in classifying approximately 300 independent contractors as employees.[2]

At a hearing on the petition held before the Presiding Officer, the Office presented the testimony of Richard Schreiber, an unemployment compensation tax agent with the Office, whose responsibilities include performing audits and wage investigations and collecting unemployment taxes.  He testified that one of Petitioner's former workers applied for unemployment compensation, but because there existed no record of earnings, a wage investigation was initiated

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§ 751–918.10.

[2] The then-Deputy Secretary for Administration dismissed the petition because Petitioner failed to attach copies of the notice for assessment and statement of assessment as per 34 Pa. Code § 63.26(d)(1) and 1 Pa. Code §§ 33.32–.37.  Subsequently, Petitioner filed a petition for reconsideration, contending that it did not receive notice that its pleading was deficient, which the Deputy Secretary granted.

to determine why Petitioner had not reported its workers' earnings on a quarterly basis.

Following the wage investigation, Mr. Schreiber audited Petitioner, reviewing its federal tax returns and Form 1099s, all cash disbursements, bank statements, the "Independent Contractor Agreement" (Agreement) it entered into with its workers, and a questionnaire completed by Mr. Robinson regarding Petitioner's positions. Mr. Schreiber noted that Petitioner's bank records showed bi-weekly withdrawals for payroll, in the form of one line item exhibiting the gross amounts paid to individuals during a two-week period. Based on his review of the records, he determined that Petitioner made payments to individuals for services rendered and issued an assessment in the amount of $83,481.00, listing the amount of gross and taxable wages per quarter.

On cross-examination, Mr. Schreiber conceded that the Agreement he reviewed was entitled "Independent Contractor Agreement." (Certified Record, 11/21/14 Hearing Transcript, at 19.) He stated that in performing an audit, he determines as an initial matter whether those engaged by an entity are employees or independent contractors. In terms of payroll withdrawals, he stated that the term "payroll" appeared on the bank's records but was not a term used by Mr. Robinson.

In support of its petition, Petitioner presented the testimony of Mr. Robinson, who discussed the various categories of jobs filled by Petitioner. Although formal job titles do not exist, he generally described the positions as

3

private instructors/tutors, review session leaders, office managers, desk assistants, print coordinators, advertisers, and note takers, although the last position no longer existed as of the time of his testimony.

With respect to tutors, he stated that not all of the workers filling this position are Penn State University (PSU) students. "When it comes to the tutors, [the] majority of them were not students. Maybe had been a student, but most of them are not. And it just kind of depends on the position. There's some that are, some that are not." (*Id.* at 112.) Mr. Robinson acknowledged that as per Petitioner's website, the tutors are required to maintain a minimum 3.8 grade point average. He advised that after a student contacts Petitioner regarding the need for services, the student will be assigned to a specific tutor according to expertise, "at which point, it's up to the independent contractor, the tutor, to create a schedule with the individual, and—that would best meet both their needs, and proceed to work with them [sic] toward achieving their [sic] goal of a better grade in the course." (*Id.* at 29.)

Further, he explained,

> I have no control over that [the manner and method of providing tutoring instruction]. I have my own students that I will meet with, and I, then, schedule with them. But as far as other students within the PSU KnowHow, it would be solely up to them to decide scheduling and manner.

(*Id.*)

4

He also stated that the instructors choose where to schedule the sessions—either onsite or offsite. With regard to training, he testified that after an individual signs the Agreement, Petitioner "proceed[s] to forward them the students who may be coming in for the discipline, and they take it over from there. No training is provided for them whatsoever. It's assumed that they're going to be able to handle whoever may be forwarded their way." (*Id.* at 31.) He testified that each of the individuals whose status as independent contractors is disputed executed the Agreement, with the wage provided, stating as follows:

### INDEPENDENT CONTRACTOR AGREEMENT

\*\*\*

3.  **Independent Contractor Status:** Robinson and Contractor agree that Contractor is an independent contractor and in particular, Robinson does not exercise control over the manner or method in which the tutoring is administered to the student by Contractor.

4.  **Manuals:** Contractor may use his/her own manuals and other materials.

5.  **Scheduling:** Contractor has flexibility in scheduling sessions.

6.  **Contractual Rate:** Robinson will pay Contractor at the rate of $____ per working hour without any deductions or withholdings for all satisfactory completed hours.

7.  **Insurance not Provided:** No workers' compensation insurance or unemployment compensation insurance is paid for or provided by Robinson.

\*\*\*

12. **Non-Compete:** Contractor agrees that during the term of this Agreement and for a period of eighteen (18) months following the termination or expiration of this Agreement, Contractor will not, directly or indirectly,

5

either as principal, agent, manager, employee, partner, director, officer, consultant, shareholder, or proprietor, on his/her behalf or on behalf of any other entity:

a. Tutor students for pecuniary gain; or

b. Become associated or affiliated with, employed by, or financially interested in any business which engages in tutoring services; or

c. Make any effort, directly or indirectly, to solicit, encourage, or induce any student/client or perspective student/client to obtain business and/or tutoring services from any entity providing activity competing with Robinson's business; or

d. Cause or attempt to cause any present or prospective student/client or Robinson to reduce his or her business with Robinson.

***

17. **Entire Agreement.** The parties affirm and agree that this Agreement sets forth the entire Agreement between the parties and supersedes all prior or contemporaneous agreements or understandings between the parties with respect to the subject matter contained herein. There are no promises, representations, warranties, guarantees, arrangements, or understandings, either oral or written which are not expressed herein. No alternation or other modification of this Agreement shall be effective unless made in writing and signed by the parties.

(Reproduced Record [R.R.] at 52a–55a.)

6

The Agreement's non-compete clause applies to all of Centre County, Pennsylvania, and Mr. Robinson stated that its purpose is to ensure that the workers "are not taking away any students that will have come in through PSU KnowHow, that the students that have come in are part of PSU KnowHow, and they're not to be taken or directed elsewhere for profit." (Certified Record, 11/21/14 Hearing Transcript, at 35.) Tutors, review session leaders, and office managers were provided with e-mail addresses bearing an "@psuknowhow.com" handle, from which they could contact prospective or current clients.

Mr. Robinson denied that the individuals are forbidden from working with or for other entities, and he stated that he makes this clear with potential workers when he reviews the Agreement with them. By way of example, he explained that one of his current workers is currently employed by Mathnasium, a competing tutoring service focusing on math courses, and he introduced an e-mail dated June 26, 2014, from Rachel Chin, advising that she "[is] currently employed at Mathnasium of State College." (R.R. at 50a.)

He also indicated that most workers engage in work with other outside entities while still engaged with Petitioner, even if they are not competitors. To this end, Petitioner presented an e-mail dated June 18, 2014, sent by Haley Randolph, stating, "During semesters and the summer, I work in a lab specializing in genetics research…. The lab is part of the biology department in the Eberly College of Science." (*Id.* at 51a.) He also presented an e-mail dated June 24, 2014, from Jennifer Cummings, advising:

7

> Outside of contract work with psuknowhow, I work part time with a psychologist (10-20 hours per week), as well as with a catering company (as needed).
>
> I am able to coordinate between my schedules with psuknowhow and with the psychologist due to flexibility. I am able to plan my work around each other in order to satisfy the needs of both. I work with the catering company for larger events only when I have free time.

(*Id.* at 49a.) Regardless of whether workers are employed by competitors, he claimed there were no repercussions for their outside work.

With respect to supervision, Mr. Robinson stated, "[t]here is no supervision whatsoever." (Certified Record, 11/21/14 Hearing Transcript, at 39.) He expounded that although Petitioner has no ability to control where its instructors meet:

> [t]here is a center provided. Being that we're at the college level of private instruction, it is a little more difficult to have a place. The university, itself, is off limits to operating for profit gain, and therefore, there isn't [sic] a lot of locations to go within the university itself, so I do provide a center where it can be done. They are not required to work there. As a matter of fact, several of the individuals have opted to work outside of there, as they see fit, meeting within a coffee shop or within an individual's room as needed.

(*Id.* at 40.) Regardless, he stated, he does not have control over the meeting location and further detailed that in the event a student drops a class or does not attend a scheduled instruction, the tutor bears the risk of loss.

Mr. Robinson testified that he does not require the private tutors to use any specific teaching materials in their instruction, but that "[t]hey are able to use whatever materials they see fit. As a matter of fact, most of them bring their own laptops, their own textbooks to be able to be used." (*Id.* at 40–41.) Mr. Robinson testified that on a daily basis, he does not have contact with the private instructors, in part because his time is dedicated to preparing his own materials for use in his private tutoring sessions.

Mr. Robinson explained that review session leaders are private tutors, and therefore, he exercises the same amount (or lack) of control over the two groups of workers. Review session leaders prepare sets of problems or review sets to use in a particular review session, which students may or may not opt to attend. The review session leaders are not paid for their time preparing but are only paid in the event students attend the review session, and therefore, the workers bear the risk that the session may be cancelled due to lack of attendance. Mr. Robinson stated that he does not dictate what the review materials should consist of, how to prepare, how to deliver the session, or how to organize the session. While review session leaders are free to use the lecture hall at the center, they are not required to do so, but it is often not feasible to meet on campus as doing so is "against Penn State's code." (*Id.* at 45.) He reiterated that scheduling of review sessions remains up to the review session leader.

Petitioner also hires print coordinators who design and print advertisements and review materials, the bulk of which are Mr. Robinson's. He denied monitoring the method or manner in which the print materials are organized

or edited, and stated that he does not schedule jobs for them or dictate where the work is performed. Likewise, he stated that he allows each print coordinator to choose the software and computer to be used. However, he clarified that if need be, they have the ability to use equipment in the center.

Additionally, Petitioner hires advertisers who promote upcoming review sessions or private instruction services and work mainly on campus by distributing materials provided by Petitioner to students and informing them of available services. The advertisers are permitted to set their own schedules and may accept or decline work as they see fit. While he assumes that they are on campus performing their jobs for the hours claimed, he does not actually observe them working. With respect to print coordinators and advertisers, Mr. Robinson testified that he has no supervision over them and confirmed that like all other workers, they are required to sign the Agreement and are compensated based upon the time sheets they provide.

Mr. Robinson stated that desk assistants primarily perform maintenance and general upkeep of the center on an as-needed basis. Less frequently, for about twenty minutes per day, they receive payments for review sessions and hand out the materials to students. As he explained, "there is a desk at the review center, and they will sometimes be at the desk, but that's certainly not the—the bulk of their work." (*Id.* at 53–54.) No supervision is provided, and particular methods, tools, equipment, or schedules are not prescribed. On average, desk assistants work about five to eight hours per week.

Finally, Mr. Robinson testified that via e-mail, the two office managers assign students seeking services to private tutors based on discipline and record invoices and receipts as well as the accompanying monetary amounts. In terms of matching students with tutors, Mr. Robinson stated that he has no role and does not control the manner or method in which the office manager pairs individuals. Again, he stated that he does not set the schedules for office managers, does not require them to work from the center, and does not supervise their work. He testified that at the present time, Petitioner employed two office managers, both of whom also served as private tutors and filled the additional position to obtain extra work. He stated "they oftentimes do work within their homes or elsewhere and bill [him] for the services." (*Id.* at 57.)

With regard to Petitioner's bank documents, he stated that Petitioner does not have a payroll. Although Mr. Robinson initially paid the workers by check, he later switched to direct deposit, which the bank lists as payroll, a description with which he disagrees. Regardless of position, he reiterated that none of the workers receive training of any type. Petitioner also submitted the questionnaire Mr. Robinson completed for the audit, detailing each position in ten points and providing an overview of why, in his opinion, Petitioner cannot operate with an employee-based system.

On cross-examination, Mr. Robinson explained that in past years, he also hired note takers who took notes during the PSU classes in which they were already enrolled and provided the notes to Petitioner, who posted them for sale. He stated that the workers recorded their hours on a sheet and were paid bi-weekly

11

via direct deposit for the total number of hours worked. He clarified that while most are paid hourly, review session leaders and note takers were paid by the session or class.

He acknowledged that Petitioner's old website contained a hyperlink labeled "employment," which listed the positions Petitioner had available at a given time. He stated over the course of a semester, approximately 150 students received tutoring services. He described the center as containing 12 individual rooms as well as his personal office and a review center on two separate floors. Students and workers could use the rooms, so long as they were available, but the rooms were not reserved in advance. Thus, if a private tutor and student intended to use a room but discovered that it was not available, they had to work externally.

In the event that Mr. Robinson received a complaint about a tutor, he typically reassigned the student to another tutor but compensated the tutor for work performed and generally allowed the tutor to be assigned work with other students. If, however, a recurring problem resulted, the tutor was not assigned future work. Likewise, if a tutor failed to attend a scheduled session, the student was reassigned and the tutor was not compensated. A single failure to attend did not affect a tutor's ability to obtain future work, unless it became a recurring problem. If a print coordinator made a mistake in printing materials, Mr. Robinson advised, "'Hey, I need, you know, to make sure that this error, you know, isn't going to continue with this material. Let's make sure to fix it in the future.'" (*Id.* at 93.) If the print coordinator did not correct the error, Mr. Robinson corrected it himself.

In terms of equipment at the center, Mr. Robinson stated that Petitioner provides tables, chairs, computers, printers, and copiers, which the print coordinators could use to print advertising materials. He explained, however, that the coordinators could also use outside facilities to print the materials, but when they did so, they were responsible for paying out-of-pocket costs for which they were not reimbursed. Conversely, if they printed at the center, they were not charged for the copies made. In the event a student did not pay for a tutoring session, the private tutor was not compensated, but Mr. Robinson attempt to follow up with and obtain payment from the student.

He stated that he arrived daily in the afternoon to begin his own tutoring sessions, at which point there may be many or very few other people present. The tutors and office managers each have keys for access. He denied posting Petitioner's hours of operation and admitted that due to this, he misses out on some business opportunities. He further emphasized that Petitioner has never withheld taxes from its workers and never provided insurance or fringe benefits to them. Petitioner does provide payments via direct deposit and issues federal 1099 tax forms.

After cross-examination, the Presiding Officer inquired how an advertiser, without instruction or training, knows what to promote to the student body. Mr. Robinson explained, "how they know what they're actually promoting is they have a flier that they would be promoting with, that would name exactly what they're to be promoting." (*Id.* at 106.) He reiterated that many of Petitioner's workers come through its website. In terms of individuals who are

13

already employed as independent contractors elsewhere, Mr. Robinson stated that they are interested in working with Petitioner because it has additional work available.

He also clarified that Ms. Chin's e-mail is indicative of how all tutors operated, in that they established independent businesses of their own and were specifically involved in tutoring. He explained, "I can attest that a good number of them [private instructors] have or are working as private instructors elsewhere." (*Id.* at 112.) He further stated that some of these individuals registered for and obtained tax identification numbers and that a majority of the tutors were not current students. Nonetheless, the ones who were students held their own positions in independently established businesses, registered with tax IDs, while studying at the university and maintaining at least a 3.8 GPA.

Regarding the process by which Mr. Robinson assigned print or copy jobs, he testified:

> I need—for example, the review session materials, that's usually what I would personally need, I would say, "Here's some review session materials. I would need these by this date." And leave it up to them to take over and do whatever they get a chance to do. Sometimes I might say, "I need this to be redesigned and then printed by this date." And, once again, just hand it over, let them redesign and print it out as they see fit.

(*Id.* at 115–116.)

In response to an inquiry regarding whether any of Petitioner's workers engaged in a competing business, Mr. Robinson stated, "[A]s a matter of fact, one of them is currently running a competing tutoring business….Grant Mc—Grant—I think his name, if I remember correctly, starts with an M. I would have to refresh my memory on it." (*Id.* at 89-90.) He explained that this was the only individual operating a competing business in the State College area. He further clarified:

> Q. So, all these individuals have their own business, and they're promoting themselves as tutors.
> A. Correct.
> Q. Do you have any documentation to support that?
> A. I would be able to come up with documentation to—
> Q. Today, do you have any?
> A. I don't have anything today.
>
> * * *
>
> A. I know the majority of them work elsewhere. So—I don't know the means by how they go about it every time, but I know that they have.
> Q. Do they have their own tax ID numbers?
> A. I'm not sure if all of them do. I know some of them do.

(*Id.* at 90-92.)

The Presiding Officer inquired if students enrolled at PSU and serving as tutors, who had the responsibility of maintaining a 3.8 GPA also held their own independently established businesses that were registered with tax IDs, to which

15

Mr. Robinson replied, "Yeah. It's certainly possible. I know that's how I, myself, got started with this, and I would assume that that's also going on. They're certainly free to do so, if they wish. And I know that a number of them have." (*Id.* at 113.)

Following the hearing, the Executive Deputy Secretary of the Department issued an order denying the petition pursuant to Section 4(*l*)(2)(B) of the Law.[3] Specifically, because he determined that Petitioner's workers performed services in exchange for fixed wages, he weighed the following factors to analyze whether Petitioner exercised the requisite control over its workers such that they should be deemed employees for purposes of the first prong of Section 4(*l*)(2)(B) of the Law: (1) method of remuneration; (2) whether payroll taxes were withheld; (3) whether Petitioner supplied the tools necessary to carry out the services rendered; (4) whether Petitioner provided on-the-job training; (5) whether Petitioner set the time and location for work; (6) whether Petitioner had the right to

---

[3] Section 4(*l*)(2)(B) of the Law provides:

> Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that--(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(*l*)(2)(B).

16

monitor the workers' work and review performance; and (7) whether Petitioner held regular meetings that its workers were expected to attend.

The Department concluded that the first and third factors weighed in favor of an employment relationship while the second and seventh factors favored an independent-contractor relationship and the fourth, fifth, and sixth factors were ambiguous. Although the Department found that Petitioner's right to control was a close call, it ultimately found in favor of an employment relationship, reasoning that after the Office demonstrates the performance of services for wages, the burden shifts to the taxpayer to prove its entitlement to an exemption.

Further, in determining whether purported employees were engaged in an independent trade for purposes of the second prong of Section 4(*l*)(2)(B), the Department considered the putative employees' proprietary interest in business and the Agreement's prohibition against workers engaging in the same line of work for 18 months after termination or expiration of the Agreement. It found that based upon these factors and the fact that Petitioner provided no evidence that its workers were customarily engaged in independent businesses, even they were sporadically engaged, Petitioner clearly failed to satisfy the second prong of the test and therefore did not meet its burden of proving that its workers were independent contractors rather than employees. This appeal followed.

## II.

Pursuant to the Law, employers are required to pay contributions in the form of a tax to the Unemployment Compensation Fund with respect to

employees they engage. Section 4 of the Law, 43 P.S. § 753. Contributions, however, need not be paid if an independent-contractor rather than an employment relationship exists. *Id.* Section 4(*l*)(1) of the Law defines "employment" as "all personal service performed for remuneration by an individual under any contract of hire, express or implied, written or oral, including service in interstate commerce, and service as an officer of a corporation." 43 P.S. § 753(*l*)(1). This broad definition of "employment" encompasses all services performed for remuneration, subject to the enumerated exceptions. *Department of Labor and Industry v. Aluminum Cooking Utensil Co.*, 82 A.2d 897, 898–99 (Pa. 1951). Thus, there exists a statutory presumption that "one who receives wages for services is employed," and a putative employer seeking to demonstrate the existence of an independent-contractor relationship bears the "heavy burden" of satisfying both prongs of Section 4(*l*)(2)(B) of the Law. *Kauffman Metals, LLC v. Department of Labor and Industry*, 126 A.3d 1045, 1050 (Pa. Cmwlth. 2015); *Electrolux Corp. v. Department of Labor and Industry, Bureau of Tax Operations*, 705 A.2d 1357, 1360 (Pa. Cmwlth.), *appeal discontinued*, 705 A.2d 1357 (Pa. 1998).

On appeal,[4] Petitioner does not dispute that the Office demonstrated that Petitioner's workers received wages in exchange for services rendered. Rather, Petitioner argues that the Department erroneously determined that it did

---

[4] Our scope of review of the Department's decision is limited to determining whether its necessary findings of fact are supported by substantial evidence or whether it committed an error of law or a constitutional violation. *Cameron v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 699 A.2d 843, 845 n.1 (Pa. Cmwlth. 1997); Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

not satisfy its burden with regard to each of the prongs under Section 4(*l*)(2)(B) of the Law.

## A.

First, Petitioner contends that the Department erred in determining that the workers were not free from Mr. Robinson's control because substantial evidence does not support the conclusion that the time and location of work, training, and monitoring factors were ambiguous. Petitioner argues that when these factors are weighed in favor of an independent-contractor relationship, the first prong of Section 4(*l*)(2)(B) is satisfied.

### 1. *Supply of Tools*
#### a. *Private Instructors/Tutors*

With respect to tutors, Petitioner claims that the only facts of record demonstrate that although Petitioner made its facility available to tutors, there existed no requirement that they use it, and as for the other tools, tutors used their own textbooks and study materials during the tutoring sessions. As such, Petitioner argues that the Department's finding of ambiguity in this regard is not supported by substantial evidence. We disagree.

Mr. Robinson testified that while tutors were not *required* to use Petitioner's center, a two-floor center comprised of twelve private meeting rooms, a waiting room where students can be greeted, and a larger lecture hall were available for their use. He explained that as per PSU's policy, for-profit corporations were not permitted on campus, and therefore, the facility proved a

19

useful meeting place, particularly with regard to larger groups that met in the lecture hall, although some tutors elected to meet in coffee shops or nearby restaurants. Additionally, the tutors were provided keys to the facility and therefore had unfettered access to it. The facility also provided tables, chairs, computers, printers, and copiers. Each tutor was given an e-mail address with the "psuknowhow.com" extension for communication purposes. Further, Mr. Robinson stated, "*most* [tutors] bring their own laptops, their own textbooks to be able to be used," thereby implying that with regard to tutors who do not use their own textbooks, materials are provided. (Certified Record, 11/21/14 Hearing Transcript, at 40–41) (emphasis added).

Therefore, the Department's finding that Petitioner supplies tools to its tutors is supported by substantial evidence. The fact that the tutors were free to reject these tools and use their own does not affect our analysis, as our inquiry turns upon whether workers were *required* to provide their own tools—not on whether they were permitted to do so. *See Weaver Hauling and Excavating, LLC v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, __ A.3d ___, (Pa. Cmwlth. No. 266 C.D. 2015, January 6, 2016), slip op. at 22 n.9 (noting that the relevant inquiry with respect to this factor is whether a putative employer's workers "actually had been required" to provide their own tools, equipment, or supplies or to pay for the items provided by the putative employer); *see also Krum v. Unemployment Compensation Board of Review*, 689 A.2d 330, 332 (Pa. Cmwlth. 1997) ("[T]he ability to control and not actual control is determinative[.]").

Nonetheless, Petitioner argues that the Department's consideration of "whether [tutors] purchase their own laptops and texts as business investments, specifically to perform tutoring, or whether they already had laptops and texts as students or former students, and thus used existing resources" is irrelevant. (8/18/15 Final Decision and Order of the Department of Labor and Industry, at 18.) In the context of the tools factor, we agree that the reasons for which workers come into possession of the personal tools they are required to utilize in performing a job is of no importance. *See, e.g.*, *Osborne Associates, Inc. v. Unemployment Compensation Board of Review*, 39 A.3d 443, 450 (Pa. Cmwlth. 2012) (noting that the evidence was inconclusive with regard to tools where the putative employer supplied expendable supplies such as shampoo, perm solution, and dyes, and the worker supplied hardware such as scissors, brushes, curling irons, and a hair dryer, without any discussion of why the worker obtained that equipment). However, the Department discussed this factor with respect to the second prong of Section 753 4 (*l*)(2)(B), not to the tools factor, and regardless, even if this discussion is eliminated, the Department's conclusion is supported by substantial evidence because tutors were not *required* to use their own computers and textbooks.

### b. *Other Positions*

Next, Petitioner argues that like tutors, the print coordinators were free to use their own tools. It asserts that advertisers required no tools, office managers used their own tools, and because there was no evidence regarding

21

whether desk assistants used tools, this factor favors the finding of an independent contractor relationship.[5]

Although print coordinators were permitted to make copies at any facility at out-of-pocket cost, Petitioner provided a facility at which they could perform their copying duties for free. Regardless of whether the print coordinators elected to take advantage of this free tool, Petitioner made it available. With respect to advertisers, the Department found that they required no tools. Therefore, to the extent it determined that this factor tilted toward a finding of employment, that finding does not apply to advertisers.

Regarding office managers, the Department emphasized that they had keys to Petitioner's center and inferred that "they work at Petitioner's center and use its files or computers to perform bookkeeping-type work and to match private instructor/tutors to student clientele….[o]therwise, the requisite uniformity necessary for the effective processing of these transactions would be compromised." (8/18/15 Final Decision and Order of the Department of Labor and Industry, at 19.) In this case, there is no evidence regarding the uniformity of Petitioner's transactions. To the contrary, Mr. Robinson testified that the workers performed their assignments as they saw fit, regardless of whether their performances were uniform. Therefore, the Department's inference that office managers worked at Petitioner's facility and used its equipment is not supported by

---

[5] Petitioner did not address the Department's application of the tools factor to review session leaders or note takers, and therefore, its conclusions are upheld with regard to those positions.

substantial evidence. Still, the fact that office managers were provided unfettered access to the facility and its equipment through the provision of keys as well as work e-mail extensions demonstrates that Petitioner provided the essential tools for office managers' use, regardless of whether they actually used them. Accordingly, the Department's conclusion that the tools factor favors a finding of employment with regard to office managers is supported by substantial evidence. *See Weaver Hauling and Excavating*, ___ A.3d ___, (Pa. Cmwlth. No. 266 C.D. 2015, January 6, 2016), slip op. at 22 n.9; *see also Krum*, 689 A.2d at 332.

The Department found that no evidence was presented regarding whether Petitioner or the desk assistants provided their tools. However, rather than finding this factor ambiguous, the Department determined that Petitioner failed to satisfy its burden regarding it, and therefore, that it favored a finding of employment. We disagree. The Petitioner must prove that on balance, the totality of the factors favor an employment finding. If, on balance, the factors are ambiguous, then Petitioner has failed to carry its burden and loses its case. However, the ambiguous nature of a factor does not necessitate an adverse inference. Rather, an ambiguous factor weighs in favor of neither an employment nor an independent-contractor relationship. Accordingly, the Department erred in equating its finding of ambiguity regarding desk assistants with an indication of an employment relationship.

In summary, with respect to the tools factor, the Department's finding that an employment relationship is indicated is upheld with respect to tutors, print

23

coordinators, and office managers. Regarding advertisers and desk assistants, this factor is ambiguous.

### 2. Time and Location of Work

"[A]n employment relationship is suggested when an employer controls the workers' work hours." *Peidong Jia v. Unemployment Compensation Board of Review*, 55 A.3d 545, 548 n.4 (Pa. Cmwlth. 2012) (alteration in original) (internal quotation marks and citation omitted). Where the putative employer has "dictated the time, place and manner for performance" by setting a "specific schedule, declaring a specific work-day and a specific location…where [a worker] must perform work during business hours" and "require[s] permission to deviate from those schedules," this factor indicates an employment relationship. *Id.*

In this case, the Department found this factor to be ambiguous, reasoning that although tutors could select their hours and location of work, as a practical matter, they were more or less confined to the center due to PSU's code which prohibited them from working on campus. The Department also determined that review sessions were held at the facility and that Mr. Robinson scheduled them. Emphasizing the phrases "office" manager and "desk" assistant, and noting that the information required to perform these jobs was located at the facility and that these jobs included the responsibility of answering the phone, the Department inferred that much of this work occurred at Petitioner's center, and therefore, this factor was unclear.

24

Substantial evidence does not support the Department's finding. First, the relevant inquiry is whether Petitioner *dictated* the time and place of performance. The undisputed evidence indicates that the occupants of all positions set their own hours. Indeed, they did not communicate their hours to, let alone have to obtain permission to change their hours from, Mr. Robinson, who learned of their hours only when they submitted timesheets. The Department's conclusion that Mr. Robinson set the hours for the review session leaders, likewise, is unsupported by substantial evidence. While he testified that he served as one of two review session leaders and set his *own* hours, at no point in time did he state that he dictated the hours the other leader worked. To the contrary, he expressly stated that review session leaders set their own schedules. Similarly, they are not *required* to work at the facility, regardless of how feasible it may be to locate an alternative workspace. In light of these facts, it is not surprising that Mr. Robinson testified that he does not post hours of operation at the center, as it cannot be predicted with any certainty if or when workers will be present there.

The Department further erred in placing undue emphasis on the labels Mr. Robinson applied to Petitioner's positions, which he noted were not official job titles. The fact that he referred to positions as "office manager" and "desk assistant" do not dictate that the associated duties must be performed at Petitioner's facility, particularly where the uncontroverted evidence indicates that Petitioner does not require office managers to work from the center. His testimony established that the crux of their work, coupling prospective students with tutors and inputting receipts and amounts made, is done electronically and may be performed from home. Moreover, there is absolutely no evidence showing that

25

either office managers or desk assistants are required to answer phones. While the former must respond to e-mails, this task can be accomplished from offsite, and Petitioner does not dictate their presence at its facility. Accordingly, because Petitioner dictated neither the time nor the place that its work was performed, the Department's conclusion that this factor was ambiguous is not supported by substantial evidence.

### 3. *Training*

In terms of on-the-job training, Mr. Robinson stated that Petitioner provided none, yet, a printout of Petitioner's website stated that it "train[s] each potential instructor…" (8/18/15 Final Decision and Order of the Department of Labor and Industry, at 19.) The Department placed greater weight on the documentary evidence than on Mr. Robinson's testimony and concluded that with respect to tutors and review session leaders (a position for which being a tutor was a pre-requisite), the documentary evidence was entitled to greater weight. Because it is within the Department's purview to weigh evidence and resolve such conflicts, we will not revisit this evidence. *Kurbatov v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 29 A.3d 66, 72 (Pa. Cmwlth. 2011). However, the only evidence provided with respect to Petitioner's other positions was Mr. Robinson's undisputed testimony that no training is provided because he assumed that the individuals holding these positions knew how to perform their assignments. Therefore, with respect to office managers, desk assistants, print coordinators, advertisers, and note takers, the Department's conclusion that the training factor is ambiguous is not supported by substantial evidence.

### 4. Right to Monitor Work and Review Performance

In resolving that Petitioner had the right to control its workers despite the lack of day-to-day supervision it exercised, the Department highlighted Petitioner's ability to reassign students in the event of student complaints, Petitioner's ability to cancel tutoring or review sessions, and the instruction provided to print coordinators regarding the materials that needed printed, designed, or created. The Department further opined that it "seems implausible that Petitioner would not have the right to exercise some degree of control over 12-20 desk assistants cleaning or maintaining its center on an 'as-needed basis'" and that "it is hard to envision that Petitioner would not determine the classes for which notes would be posted for sale." (8/18/15 Final Decision and Order of the Department of Labor and Industry, at 22.)

Simply informing a worker of general project requirements or ensuring that those requirements are satisfied does not indicate that a putative employer monitors work or reviews performance. *Resource Staffing, Inc. v. Unemployment Compensation Board of Review*, 995 A.2d 887, 892 (Pa. Cmwlth. 2010). Merely "exercis[ing] the minimal amount of control necessary to ensure the quality of services provided" does not tilt this factor in favor of an employment relationship. *Id.* (holding that where a worker spoke to his supervisor, who only ensured that he satisfied the general project requirements, every other month and met with her twice during the period, the organization satisfied its burden of proving that it did not exercise the requisite degree of control over its workers). Further, as we stated in *SkyHawke Technologies LLC v. Unemployment*

*Compensation Board of Review*, our analysis does not turn upon the fact that a worker may face consequences for providing unsatisfactory work because:

> "[c]ontrol" for purposes of Section 4(*l*)(2)(B) of the Law is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment, because every job, whether performed by an employee or independent contractor, has parameters and expectations…. Thus, we conclude that this factor does not transform [an entity] into [an] employer because work performed as an independent contractor must be acceptable to whoever has requested the services or products.

27 A.3d 1050, 1056–57 (Pa. Cmwlth. 2011) (alteration in original) (internal quotation marks and citation omitted); *see also Osborne Associates, Inc. v. Unemployment Compensation Board of Review*, 39 A.3d 443, 450 (Pa. Cmwlth. 2012).

The fact that Petitioner was able to reassign students when their tutors were not providing a satisfactory work performance is not indicative of Petitioner's ability to supervise the tutors' work. Rather, as we indicated in *Resource Staffing* and *SkyHawke*, this action only evidences an organization's ability to ensure the quality of services provided. Further, in instructing print coordinators regarding which items needed printed or designed, Mr. Robinson did not "supervise" them, but only provided assignments. Similarly, when it engaged note takers, Petitioner undoubtedly determined the classes for which notes would be posted for sale and based upon its decision, engaged individuals in those courses to provide their notes. The fact that it acted in this manner does not, in any form, evidence that it

28

"supervised" or "reviewed work" of its workers. Indeed, there is no evidence showing that Mr. Robinson oversaw the performance of any worker in any capacity other than to provide general quality control. The Department's findings to the contrary distort the evidence and are not supported by substantial evidence.

In summary, the remuneration factor indicates an employment relationship; the lack of tax withholdings, lack of regular meetings, timing and location of work, and right to monitor work and review performance factors indicate an independent-contractor relationship; the tools factor indicates an employment relationship with respect to tutors, review session leaders, print coordinators, office managers, and note takers but is ambiguous regarding desk assistants and advertisers; and the training factor indicates an employment relationship with regard to tutors and review session leaders, only, and an independent-contractor relationship as to the other positions.

In balancing these factors, the scales tilt heavily toward a finding of an independent-contractor relationship with respect to print coordinators, office managers, desk assistants, advertisers, and note takers. Further, although Petitioner's case may not be as clear-cut regarding tutors and review session leaders, Petitioner nonetheless satisfied its burden in this respect as well. Therefore, we reverse the Department's findings with regard to the first prong of Section 4(*l*)(2)(B) of the Law as unsupported by substantial evidence.

**B.**

Regarding Section 4(*l*)(2)(B)'s second prong, Petitioner argues that the Department applied the wrong standard in determining whether the workers were engaged in an independent trade insofar as it focused on whether the workers had a proprietary interest in other businesses which would enable them to operate freely from the control of Petitioner. In construing the second prong, the following three factors are relevant: "(1) whether the individuals are able to work for more than one entity; (2) whether the individuals depend on the existence of the presumed employer for ongoing work; and (3) whether the individuals were hired on a job-to-job basis and could refuse any assignment." *Gill v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 26 A.3d 567, 570 (Pa. Cmwlth. 2011).

### 1. *Ability to Work for More than One Entity*

With respect to the first factor, the Department reasoned that the Agreement specifically prohibited all individuals from providing any tutoring services or otherwise working for competitors, not only while engaged in work for Petitioner but also for a period of eighteen months following termination or expiration of the Agreement. While such non-compete clauses are not dispositive for purposes of Section 4(*l*)(2)(B), they are an important consideration. *SkyHawke Technologies LLC*, 27 A.3d at 1058. Nonetheless, Petitioner argues that "Mr. Robinson's testimony was clear that the contractors are free to perform their services for themselves or another individual or entity at any time" and that the three e-mails in which Petitioner's workers acknowledged they held jobs elsewhere

establishes "uncontroverted" evidence sufficient to tilt the first factor in favor of an independent-contractor relationship. (Brief for Petitioner, at 34.)

We disagree. As we previously discussed, the Department as factfinder has the duty to weigh conflicting evidence and resolve conflicts. *Kurbatov v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 29 A.3d 66, 72 (Pa. Cmwlth. 2011). In this case, the Department placed greater weight on the non-compete clause than on Mr. Robinson's conflicting testimony. It likewise found unavailing Petitioner's invitation to extrapolate from three individuals' e-mails that the majority of over 300 workers were able to work for entities other than Petitioner, despite the Agreement's express language to the contrary, particularly where the e-mails evidenced only one individual who worked for a competitor. Moreover, those individuals' e-mails were dated 2014, after the relevant tax years and provided no historical insight. Likewise, although Mr. Robinson stated that Grant M. was operating a competing business in State College, no one by the name of Grant was named on the list of positions for which the audit was conducted. *See Danielle Viktor, Ltd. v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 892 A.2d 781, 801 (Pa. 2006) (holding that whether workers are able to work for competitors is relevant). *But see SkyHawke*, 27 A.3d at 1052 (explaining that a non-compete clause did not preclude a worker from performing global positioning satellite mapping services for more than one entity when the non-compete applied only to golf courses). The Department's finding is further supported by paragraph 17 of the Agreement, which states that it cannot be altered or modified orally. Therefore, to the extent Petitioner claims that the non-compete

31

clause was modified by Mr. Robinson's oral instructions to workers, this argument violates the express language of the Agreement.

### 2. Dependence on the Putative Employer for Ongoing Work

With respect to the second factor, the Department determined that workers were dependent upon Petitioner because, as per the non-compete clause, they could not work elsewhere. Further, because at least a portion of the workers were PSU students who worked only part-time and sought hours from Petitioner, they were dependent upon it for ongoing work in this field. The foregoing constitutes substantial evidence upon which the Department's conclusion was based.

Petitioner relies on the facts that Mr. Robinson's testimony established the existence of other private tutoring businesses in the area and that the vast majority of workers earned less than $1,000.00 per year from Petitioner. It cites *Applied Measurement Professionals, Inc. v. Unemployment Compensation Board of Review*, for the proposition that the workers' low compensation compelled them to look to many sources to make a living wage. 844 A.2d 632, 636 (Pa. Cmwlth. 2004) (*en banc*). There, in evaluating the second factor, we noted that the putative employer did not bind its workers to an exclusivity agreement and that there were approximately forty additional companies for which the workers could perform services. We also explained that it would be impractical for the subject worker to perform services only for the putative employer because, even if she performed all of the work available, she could earn only about $1,000.00 per year.

First, the pertinent inquiry is whether the Board's conclusion is supported by substantial evidence, not whether there exists evidence to support an alternate conclusion. *See Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998). Regardless, *Applied Measurement Professionals, Inc.* is inapplicable to the case at hand. While the Department did not dispute that competitors existed for which the workers theoretically could work, for the reasons discussed above, it determined that in actuality, the workers were precluded from working for those entities. Unlike in *Applied Measurement Professionals, Inc.* where the non-compete clause was limited with respect to one type of location, *i.e.* golf courses, here, the covenant precluded workers from tutoring students with regard to any subject and is not so narrowly tailored. Furthermore, unlike in that case, here, there is evidence that an unknown portion of the workers were students enrolled at PSU. The argument that they *had to* earn more than $1,000.00 per year in order to survive, particularly where Petitioner required them to maintain 3.8 GPAs, is misplaced.

Additionally, Petitioner relies upon the three e-mails it submitted and Mr. Robinson's testimony that the majority of workers engage in outside work. The e-mails do not pertain to the relevant time period and therefore do not aid Petitioner's case. Moreover, two of them involve outside jobs held in different fields—that is, in an on-campus science laboratory and at a psychologist's office/catering company—but the relevant inquiry pertains to work within the same field. *See* 43 P.S. § 753(*l*)(2)(B) ("Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown…that…(b) as to such services such individual is customarily engaged in an

33

independently established trade, occupation, profession or business."); *Applied Measurement Professionals, Inc.*, 844 A.2d at 636 (analyzing whether exam proctors were compelled to rely upon one organization for ongoing work when over forty other testing companies existed); *Gill v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 26 A.3d 567, 570 (Pa. Cmwlth. 2011) (evaluating whether additional flooring installation work was available for flooring installers). Therefore, these additional e-mails do not assist Petitioner.

### 3. *Hiring on a Job-to-Job Basis and Ability to Refuse Assignments*

The third factor is satisfied where a worker is provided work on an as-needed basis and where he is free to accept or reject work, at his discretion. *Gill*, 26 A.3d at 570. The Department distorted the standard by determining that although there was evidence that workers could turn down assignments, the record was devoid of evidence regarding how often this occurred. However, the pertinent inquiry is "whether the individuals were hired on a job-to-job basis and **could** refuse any assignment." *Id.* (emphasis added). Indeed, the conclusion that workers were not free to refuse work has absolutely no support in the record and is not even supported by the Department's own factual finding.

### 4. *Customary Engagement in an Independently Established Trade, Occupation, Profession or Business*

Finally, as we established in *Minelli v. Unemployment Compensation Board of Review*, "the Law requires an additional element, that the [worker] be

34

*customarily* engaged in such trade or business" or be "engaged in ongoing business activities rather than an isolated or sporadic job(s)." 39 A.3d 593, 598 (Pa. Cmwlth. 2012) (*en banc*). In its decision below, the Department reasoned that Petitioner's e-mails were not reflective of independent businesses and that the "sampling of three individuals comes across as rather meager in comparison to the listing of approximately 300 individual offered into evidence by Petitioner." (8/18/15 Final Decision and Order of the Department of Labor and Industry, at 26.) With respect to the workers who were also PSU students, the Department emphasized the difficulty these individuals would encounter attending class, tutoring, maintaining a 3.8 GPA, and establishing independent businesses in which they customarily engaged. For these reasons, the Department's conclusion is based upon substantial evidence with regard to this additional factor.

Finally, Petitioner suggests that the Department placed undue emphasis upon whether each worker demonstrated a proprietary interest in a business that he can operate freely from the control of other individuals in determining whether the workers were in independently established trades. In this regard, our Supreme Court has cautioned not to place too much emphasis upon the "proprietary" interest factor and explained that a proprietary risk of financial loss is not necessary to establish a worker's status as an independent contractor. *Danielle Viktor, Ltd. v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 892 A.2d 781, 794 (Pa. 2006). "[T]he ownership of the assets of the enterprise, although not a definitive factor, may be relevant to determining independent contractor status." *Id.* at 800.

35

The Department explained that although workers may lose an opportunity in the event a client does not attend a tutoring or review session, this comes in the form of lost work rather than in the form of a proprietary risk. Further, noting that there was no evidence to demonstrate that the workers made *any* monetary investment in business assets or bore any risk of loss, the Department found this factor in favor of employment status. Although we find the Department's conclusion supported by substantial evidence, this additional factor does not change the overall balance of the factors, which already favors an employment relationship.

Accordingly, because the Department's conclusion that Petitioner did not establish that its workers are independent contractors under the second prong of Section 4(*l*)(2)(B) of the Law is supported by substantial evidence, we affirm its denial of the petition for reassessment.

DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeremy Robinson, t/d/b/a PSU KnowHow,

Petitioner

v.

Department of Labor and Industry, Office of Unemployment Tax Services,

Respondent : No. 1711 C.D. 2015

# **O R D E R**

AND NOW, this 31st day of March, 2016, the order of the Department of Labor and Industry dated August 18, 2015, denying Jeremy Robinson, t/d/b/a PSU KnowHow's petition for reassessment is hereby affirmed.

_____

DAN PELLEGRINI, Senior Judge