CONCURRING & DISSENTING OPINION BY JUDGE McCULLOUGH Although I concur in the result reached, by the thoughtful Majority, I must re.-: spectfully depart from its reasoning and application of precedent in unemployment-compensation law. Based on this record, we are compelled to apply the standard test as developed and endorsed by our Supreme Court and more fully discussed herein. Here, Donald Lowman (Claimant) separated from his employer in the behavioral health field, Resources for Human Development, and filed a claim for unemployment compensation benefits. Before the local service center issued a determination, Claimant signed a “Software License and Online Service Agreement” (Agreement).' In this Agreement, Uber granted Claimant a “non-transferrable license to install and use the [Uber] App on [his smartphone] solely for the purpose of providing Transportation Services.” (Agreement, § 2.62.) In exchange, Claimant agreed to pay Uber “a service fee on a per ... transaction basis calculated as a percentage of the Fare ... as provided or otherwise made available by [Uber] from time to time .... ” (Agreement, § 4.4.) Claimant began providing driving services through/for Uber on July 1, 2015, and continued to do so up until and including October 28, 2015, the date of the hearing in this, matter. The Unemployment Compensation Board of Review (Board) determined that Claimant was disqualified' from receiving benefits because his stint with Uber constituted “self-employment.” Applying the traditional test in Danielle Viktor, Ltd. v. Department of Labor and Industry, Bureau of Employer Tax Operations, 586 Pa. 196, 892 A.2d 781 (2006), the Board found that Claimant was “customarily engaged in an independently established ... business” under the second prong of section 4(l)(2)(B). of the Unemployment Compensation Law (Law).[1] In Danielle Viktor, our Supreme Court' determined whether individuals who drove limousines for six limousine companies were self-employed, and the court did so by focusing on the relationship between the two to decide if the drivers provided their services “independent” of the limousine companies. Although Danielle Viktor presents a factual situation (limousine drivers) that is remarkably analogous to this case (an Uber driver), the Majority concludes that the Board’s analytical model “misses the mark,” (Maj. op. at 901), and proceeds to reconstruct a brand new legal framework to resolve this case. the Majority’s Test For its underlying premise, the Majority holds that the Board “erred by framing the analysis as an either/or situation.” (Maj. op. at 902). However, the Board did no such thing. Instead, applying the analysis we said was appropriate in these types of proceedings in Training Associates Corp. v. Unemployment Compensation Board of Review, 101 A.3d 1225 (Pa. Cmwlth. 2014), the Board determined that Claimant was self-employed through his work with Uber, expressly finding that the relationship between Claimant and Uber “was ongoing,” and, thus, “Claimant’s separation from [Uber] was not relevant to the Board’s determination.” Silver v. Unemployment Compensation Board of Review, 34 A.3d 893, 899 (Pa. Cmwlth. 2011); see Training Associates, 101 A.3d at 1233-34. Because “the Board’s opinion only determined that Claimant was ... disqualified from [receiving] benefits based on [his] previous separation from [Resources for Human Development]” and “there was no finding that Claimant was an employee of.[Uber] or that [Uber] was Claimant’s employer,” there is no either/or problem in this case. Training Associates Corp., 101 A.3d at 1233-34. ■ According to the Majority, the Board created “an either/or situation” by “[alp-plying the two-part test in Section 4(¿)(2)(B)” to Claimant’s particular situation. (Maj. op. at 901.) However, as this Court clarified in Training Associates, “[although the analysis in this proceeding should not be framed as an either/or situation,” there must be a “mechanism to determine, in the first instance, whether [Claimant] is engaged in self-employment.” Id. at 1233. We explained that “because [the claimant] received wages from [the putative employer] for services performed,” the putative employer “must be included in the proceedings, albeit not necessarily as a party, in order for all of the evidence to be before the decision maker.” Id. at 1234. Importantly, this Court in Training Associates confirmed that, “in examining whether a claimant is self-employed, the entity that has firsthand evidence of whether the claimant was engaged in self-employment must necessarily be initially named as a new ‘separating employer’ in order for that entity to have notice and an opportunity to present such evidence.” Id. It is for this very reason that Uber participated in the proceedings and filed a brief in this case, as did the putative employer in Training Associates. Our case law has made it clear that “the first element of Section 4(l)(2)(B)” and the “second element of Section 4(l)(2)(B),” ie., “both of these showings,” must be established in order to render a claimant ineligible for benefits, when the claimant is working after he has received, or is eligible to receive, benefits from a prior separating employer. Minelli v. Unemployment Compensation Board of Review, 39 A.3d 593, 596-97 (Pa. Cmwlth. 2012) (en banc). Indeed, as this Court has routinely held, the two-prong test of section 4(l)(2)(B) is the same regardless of whether it is an “independent contractor” case involving the separating employer, or a “self-employment” case involving work undertaken with a new entity following separation from an employer. See, e.g., Silver, 34 A.3d at 896; Venango Newspapers v. Unemployment Compensation Board of Review, 158 Pa. Cmwlth. 379, 631 A.2d 1384, 1387 (1993); Buchanan v. Unemployment Compensation Board of Review, 135 Pa.Cmwlth. 567, 581 A.2d 1005, 1007-08 (1990); Laswick v. Unemployment Compensation Board of Review, 10 Pa.Cmwlth. 356, 310 A.2d 705, 709 (1973). The Majority’s decision has now muddied these waters. The Majority concludes that the Board erred when it “focused on Claimant’s relationship with Uber and the degree of dependence between the two,” (op. at 901), stating that the relationship “is not an issue for this Court to consider,” id, at 901. But- of course it is. Claimant is not performing his activities in a vacuum. To the contrary, Uber “has firsthand evidence of whether [Claimant] was engaged in self-employment,”, and “it is critical that all of the fácts and evidence regar ding-the relationship between [Claimant] and [Uber] be presented.” Training Associates, 101 A.3d at 1234. Regardless of the Board’s or this Court’s conclusion as to whether Claimant was customarily engaged in an independently established business,' Uber will suffer no adverse legal consequences from the determination. See id. Moreover, this is not a case where Claimant began working on the side, all on his own, or in a similar fashion to the claimants in the cases upon which the Majority relies.[2] Nonetheless, after subtracting Uber from the' picture and viéwing Claimant’s activities as independent from any putative employer, the Majority adopts a ’ new, “side-line activity” test, (Maj. op. at 902-03), which apparently is a hybrid of a “positive step” inquiry, see id. at 899-01; and a “customarily engaged” assessment, see op. at 901-02. The Majority looks at how many “positive steps” Claimant undertook toward establishing a business (ie., being a driver for hire) that the law plainly says he cannot establish. It has for a long time béen illegal — and continues to be illegal — to transport passengers for compensation in Pennsylvania without a taxicab or' limousine license. See Commonwealth v. Babb, 166 Pa.Super. 63, 70 A.2d 660, 662-63 (1950). There is no evidence that Claimant has either one of these licenses, and section 1.2 of Act 164 of 2016[3] prohibits an Uber driver from soliciting “potential passengers” or accepting “a street hail or telephone call for transportation of a person in a motor vehicle.” 53 Pa.C.S. § 57A13(b)(l), (3). True, the positive step test is useful in cases where a claimant embarks to start his own business, and/or is not working for an entity or putative employer, focusing on the extent to which, or how far along, the claimant has “established” the business and has become “self-employed.”[4] However, it is not the most suitable test in this case where Claimant has completed all the steps or acts necessary to work for Uber, has worked through Uber for four months, and could not be a driver for hire absent his relationship with Uber. The Majority also appears to intermingle case law regarding the “customarily engaged” element, (op. at 901-02), which holds that, in order to be disqualified from receiving benefits, the amount or duration of a claimant’s work must be routine and regular. While an “occasional offer of a limited amount of work over ... a short time period” does not suffice, this test does not apply where, as here, a claimant is “clearly engaged in ongoing business activities rather than an isolated or sporadic job(s).” Minelli, 39 A.3d at 598.[5] Nonetheless, the Majority posits that Claimant was “engaged in short-term” work that is “sideline in nature,” or a “sideline activity,” (op. at 902-03), asserting that there was “no evidence to show the ‘level of time and effort’ Claimant put into his alleged ‘business,’” id. at 903. However, the record and the Board’s findings, which are supported by substantial evidence, prove otherwise. Specifically, the Board found that Claimant worked most days during his four-month relationship with Uber, earning approximately $350.00 per week; his driving history with Uber was “frequent and prolonged, rather than occasional and limited;” and Claimant was not working on an as-needed basis because he could turn on the Uber App and work during any time he desired. (Board’s decision at 3^1) (emphasis added). To the extent the Majority concludes that Claimant did not possess “an entrepreneurial spirit or [the] intentions of starting a new business,” (op. at 900), the Board found that there was no evidence upon which it could conclude that Claimant was “just trying to earn some extra money on the side” or that “he only drives for Uber to earn part-time income as he searches for re-employment in his career field.” (Board’s decision at 4) (emphasis added). Hence, it is unclear where the Majority finds its evidence of Claimant’s intent or “spirit.” Certainly, Claimant never offered any testimony to this effect. Id. Here, the facts and law dictate that Claimant could not legally operate as a driver for hire on his own but only under the rubric of Uber. His work through Uber was consistent and prolonged. Hence, I believe the Board properly applied the Supreme Court’s three-part test in Danielle Viktor to decide whether Claimant was operating an “independently established” business. However, I would conclude that the Board erred in determining that Claimant was conducting a business “independent” of Uber. The Danielle Viktor test The three factors that comprise the Supreme Court’s test in Danielle Viktor are: (1) whether the individual depended on the existence of the presumed employer for ongoing work; (2) whether the individual is able to work for more than one entity; and (3) whether the individual was hired on a job-to-job basis and could refuse any assignment. 892 A.2d at 797-98. Whether the individual depended on the existence of the presumed employer for ongoing work Our Supreme Court has held “that one cannot be ‘customarily engaged in an independently established ... business’ where ‘he is dependent upon another for the continuance of his employment.’” Danielle Viktor, 892 A.2d at 798 (quoting Commonwealth v. Hecker & Co., 409 Pa. 117, 185 A.2d 549, 553 (1962)). Inherent within the phrase “independently established” is the requirement that a claimant be involved in an enterprise that exists separate and apart from the relationship with the particular, purported employer, namely one that •will survive termination of that relationship. Here, the Uber App undoubtedly creates and supplies the indispensable business that is needed for Uber to operate. See Executive Transportation Co., Inc. v. Pennsylvania Public Utility Commission, 138 A.3d 145, 151 (Pa. Cmwlth. 2016) (en banc). Claimant can only provide rides when the offers are submitted through the Uber App, and this is the sole means by which Claimant connects, meets, or interfaces with a passenger. The Board fourid that ‘‘[Claimant] did not have his own business cards or advertise his driving services independent of Uber.” Board’s Finding of Fact (F.F.) at No. 15; cf. Danielle Viktor, 892 A.2d at 785, 787-88 (stating that the limousine drivers could “obtain clients,” hand out “business cards,” and “advertise their services using their own letterhead”). And for good reason. Claimant cannot lawfully promote a business that Pennsylvania statutes and regulations mandate that he cannot form or conduct independently on his own. As such, I cannot say that, minus Uber’s assistance, Claimant “was capable of performing the activities in question for anyone who wished to avail themselves of the services.” Venango Newspapers, 631 A.2d at 1388; accord, e.g., Kurbatov v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services, 29 A.3d 66, 70 (Pa. Cmwlth. 2011); cf. Danielle Viktor, 892 A.2d at 796 n.14 (pointing out that the limousine drivers, who were licensed to drive a limousine, “were not subject to a statutory prohibition regarding their driving services.”). The dependent nature of the working relationship between Claimant and Uber is further reflected by the fact that Claimant is legally required to visibly display the Uber decal on his personal vehicle when working as a transportation network driver. Board’s F.F. at No. 6; see section 1.2 of the Act, 53 Pa.C.S. § 57A10(a). Unable to build his own client base, Claimant could not rely on his own unique characteristics and/or work ethic, but instead was'“dependent upon both the good will of [Uber] and its services ... to obtain customers.” Hecker, 185 A.2d at 553. With regard to wages, the passengers pay Uber through an account associated with the Uber App and, after Uber takes it share, it pays the drivers: Agreement, § 4.4; Claimant’s Ex. 2; N.T. at 11. The Board found that Uber unilaterally determined Claimant’s compensation rate, and the Agreement does not permit Claimant to independently negotiate with or propose a fare to a passenger that exceeds the price devised by Uber. See Board’s F.F. at No. 11; Board’s Decision at 3; Agreement, §§ 4.1, 4.2, 4.4. The Agreement also vests Uber with the authority to inspect all- instances of transportation services and. to condition, payment to the drivers upon its approval. See Agreement, §§ 2.5.2, 4.4; cf. Danielle Viktor, 892 A.2d at 796 n.14 (highlighting the fact that the limousine drivers “did not require approval from [the purported employers] regarding their job performance”).. Finally, the Agreement bars Uber drivers from delegating or subcontracting their assignments to another individual, which is something self-employers and independent contractors are naturally and typically able to do. See Agreement, §§ 2.62, 5.2; cf Danielle Viktor, 892 A.2d at 797 (finding it weighty that a limousine driver could “substitute other workers of his or her choice when he or she chose not to complete an assignment.”). The record and applicable law demonstrate that Claimant depended on Uber for the existence and operation of transportar tion network services. The Department has failed to prove .to the contrary. Accordingly, I would conclude that the Department has not met its burden to show that Claimant was not dependent upon Uber forwork. Whether the individual was hired on a job-to-job basis and could refuse any assignment In Danielle Viktor, the fact that the limousine drivers could refuse an assignment took on legal significance in the context where there could be no adverse consequences for refusals. See Danielle Viktor, 892 A.2d at 785 (“Drivers' can accept or reject jobs without repercussions”); id at 787 (“There are no ramifications for a Driver who refuses an assignment”); id at 788 (reiterating that there “are no negative consequences attached to such refusals.”). Considering the pertinent sections of the Agreement together, there cleariy remains an issue as to whether Uber has the power to terminate or otherwise discipline Claimant for refusing to accept a sufficient amount of passengers’ requests for transportation services. See Agreement, §§ 2.4, 2.5.2, 3.1, 12.2.[6] While the record indicates that Claimant maintained acceptance rates at 90% and above, (Claimant’s Ex. 7-8), 'the real issue is whether Uber has the ability to impose discipline for a driver’s refusal to aecept rides, not whether Uber has, in fact, imposed such discipline.[7] Therefore, on this record, I would conclude that the Department has failed to establish that Claimant could refuse assignments without consequence. See also Glatfelter Barber Shop v. Unemployment Compensation Board of Review, 957 A.2d 786, 793 (Pa. Cmwlth. 2008) (concluding that the presumption in favor of benefits was not overcome where the record was devoid of competent evidence as to “whether there would be any repercussions for such a refusal.”). Whether the individual is able to work for more than one entity Claimant testified that, aside from the Uber App, he has no experience using an app to provide transportation services and stated that he never considered working with Lyft, Inc. (Lyft), a known competitor of Uber. N.T. at 39-40. Pursuant to this Court’s case law, the fact that Claimant could, but did not, work elsewhere does not establish that he engaged in an independent business. See Jia v. Unemployment Compensation Board of Review, 55 A.3d 545, 549 (Pa. Cmwlth. 2012) (concluding that proof that “Claimant could work for others does not establish that he engaged in an independent business, and did work for others.”) (emphasis in original). Moreover, there is an issue as to whether Claimant’s “work schedule provided him with little time to offer his services elsewhere.” Glatfelter, 957 A.2d at 792. The Board determined that Claimant “worked most days during his relationship with Uber” and that his “driving was frequent and prolonged,” yet opined, without any supporting evidence, that “he could have easily expanded his services to earn additional income.” (Board’s decision at 3-5.) However,' an examination of the record indicates that it is unclear whether Claimant, as a practical matter, was “capable” of providing driving transportation services to an entity other than Uber. See Claimant Exs. 3-6; cf. Office v. Softrock Geological Services, Inc., 325 P.3d 560, 565 (Colo. 2014) (concluding that “the number of weekly hours the putative employee actually worked for the employer” and “whether the putative employee even sought other work in the field” are factors relevant in the matrix). Significantly, there is no evidence regarding the amount of time that Claimant was actually “on the road” or how long he drove with the Uber App on while waiting to be connected with a passenger, Without this evidénce, it is indeterminable whether Claimant could have realistically pursued work with Lyft or devoted more time utilizing the Uber App. Therefore, the Department has failed to prove that Claimant was capable of working for more than one entity. Conclusion For these reasons, I would conclude that the Department did not carry its burden of establishing that Claimant, was engaged in an “independently • established” business. To me, the instant case is clearly distinguishable from Danielle Viktor, in which our Supreme Court determined that limousine drivers were self-employed.[8] Unlike the nature of the evidence presented in Danielle Viktor, the Department’s evidence here failed to show that Claimant did not depend on Uber for business; failed to prove that Claimant could refuse any assignment without consequence; and failed to establish that Claimant was able to work for more than one entity, whereas the evidence in Danielle Vicktor affirmatively demonstrated the opposite. Hence, although I disagree with the reasoning that the Majority employs to resolve this case, I concur in its decision insofar as it reverses and remands to the Board to award Claimant benefits. . Act of December 5, 1936, Second Ex.Sess,, P.L. (1937) 2897, as amended, 43 P.S. § 753(7 )(2)(B). . In Teets v. Unemployment Compensation Board of Review, 150 Pa.Cmwlth. 419, 615 A.2d 987 (1992), the claimant signed a distributor agreement, purchased a sales kit for skin care products, and sold those products. In Buchanan, the claimant bought spools of gold chain to make necklaces ■ and bracelets for sale at a weekly flea market and spent one •entire week selling the items. . Act of November 4, 2016, P.L. 1222, No. 164. . See e.g., Buchanan v. Unemployment Compensation Board of Review, 135 Pa.Cmwlth. 567, 581 A.2d 1005, 1007-08 (1990) (and cases cited and discussed therein); Salamak v. Unemployment Compensation Board of Review, 91 Pa.Cmwlth. 493, 497 A.2d 951, 954 (1985); Roberts v. Unemployment Compensation Board of Review, 55 Pa.Cmwlth. 52, 422 A.2d 911, 912 (1980); Leary v. Unemployment Compensation Board of Review, 14 Pa. Cmwlth. 409, 322 A.2d 749, 750 (1974) (en banc); see also Minelli, 39 A.3d at 596-97; Silver, 34 A.3d at 894-95. .In Silver, the claimant performed three hours of work over a three-month period. In Minelli, the claimant worked a total of twenty-two hours in a three-day period. . One provision of the Agreement states that Claimant has "the option, .via the [Uber] App, to attempt to accept or to decline a [passenger’s] request for Transportation Services.” ' Agreement, § 2.4, Nonetheless, in another section of the Agreement, Claimant "acknowl- . edge[s] that [his] repeated failure to accept [passenger] requests for Transportation Services while [he is] logged in to the [Uber] App creates a negative experience for [consumer-passengers] of Uber’s mobile application.” Agreement, § 2.5.2. Uber instructed the drivers that they must follow the terms and conditions of the Agreement and Uber’s "standards” and "policies.” See Agreement, §§ 3.1, 12.2. Specifically, section 3.1 provides: “You ' acknowledge and agree that [Uber] reserves the right, at any-time in .[Uber’s] sole discretion, to deactivate or otherwise restrict you from accessing or using the [Uber] App ... if you fail to meet the requirements set forth in this Agreement.” Agreement, § 3.1. Section 12.2 states: "[Uber] may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and polices of [Uber] and its Affiliates, to provide Transportation Services, or to operate the Vehicle, or as otherwise set forth in this Agreement.” Agreement, § 12.2. . Holtzman-Conston testified that, "to the best of his knowledge,” Uber does not terminate a driver’s use of the Uber App if the driver’s acceptance rate falls too low. (N.T. at 18-19.) This testimony, however, is not based on personal knowledge and is therefore insufficient to support a factual finding. See Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000); see also Hughes v. Unemployment Compensation Board of Review, 51 Pa. Cmwlth. 448, 414 A.2d 757, 758-59 (1980), . In Danielle Viktor, the Supreme Court consolidated appeals from this Court and deler-mined whether the limousine drivers (Drivers) of six different limousine companies (Companies) were employees for purposes of imposing unemployment compensation taxes. The facts in those cases established that all of the Drivers could have provided their services to other limousine companies, including each of the individual Companies, and that a notable number of the Drivers actually did. In essence, because the Drivers furnished their services to any limousine company they chose, on their own terms, and did not operate to promote the business of any one of the Companies, see 892 A.2d at 799, "the limousine companies ... were their clients." Id. at 801. Ultimately, the Supreme Court concluded that the Drivers were not employees of Companies. In doing so, the Supreme Court found that they were customarily engaged in their own independently established trade, summing up the basis for its holding as follows: Evidence of record showed that the business of Drivers was not subject to the control of [Companies], was not a business unit or other component of the business of [Companies], and was not connected in a subordinate manner to any of the [six] companies. [Companies] were clients of Drivers, but Drivers did not depend on [Companies] for their existence, operation, or efficiency. If any one of the [Companies] were to cease conducting business, or to decide not to contract with Drivers, Drivers would not be out of employment. Drivers were free to perform their services for any other limousine company and were not compelled to look to the existence of any one [of the Companies] for continuation of their ability to provide driving services. Id. at 795.