IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Attain Learning Center, LLC,     :
               Petitioner     :
                                 :
           v.              :   No. 735 C.D. 2017
                                 :   Submitted: April 12, 2018
Department of Labor and Industry,   :
Office of Unemployment     :
Compensation Tax Services,     :
               Respondent     :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                   FILED: May 9, 2018


       Attain Learning Center, LLC (Attain) petitions for review of the Secretary of Labor and Industry's (Department) decision denying Attain's Petitions for Reassessment with the Office of Unemployment Compensation Tax Services (OUCTS) and finding that Attain failed to meet its burden to establish that the individuals who worked as tutors for Attain were independent contractors rather than employees under Section 4(l)(2)(B) of the Unemployment Compensation Law (Law).[1] For the following reasons, we affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 753(l)(2)(B).

Attain provided after-school tutoring services through contracts with various school districts in Pennsylvania. Michael Zarreii (Mr. Zarreii), the owner and executive director of Attain, hired individuals to be tutors for Attain's after-school programs. Mr. Zarreii required tutors to sign subcontractor agreements containing a non-compete clause restricting them from working for competitors while they were working for Attain and for 90 days after their work for Attain ended. Tutors were also required to take a psychological test to ensure that they were suited for the position. Attain, however, did not conduct regular meetings with the tutors or monitor them apart from their students' attendance records. Attain also provided the tutors with 1099 forms and did not take taxes out of their paychecks.

In October 2014, OUCTS began an audit of Attain, starting with the 2013 tax year. OUCTS reviewed the 1099 forms, Attain's cash disbursement records, its corporate tax return for 2010, quarterly unemployment compensation (UC) tax reports and the subcontractor agreements Attain had with its tutors. Hanima Amara (Ms. Amara), a UC tax agent, spoke personally with Mr. Zarreii who told her that the tutors were not allowed to deviate from the computer program Attain developed for tutoring and that tutors were prohibited from giving "pep talks" to the children. (Reproduced Record (R.R.) at 328a.)

Ms. Amara testified that she sent questionnaires to the tutors who had received 1099 forms. In response to the questions, "Was your work supervised closely?" and "Was your work supervised regularly?", most of the tutors

responded, "Yes." Furthermore, most of the tutors responded, "No" to the following questions:

- Do you own or operate your own business?

- Was your work supervised only upon completion of the job?

- Do you have your own tools?

- Do you repair them yourself?

- Do you buy your own supplies?

- Do you present a bill for work completed?[2]

Following the audit, the Department sent Attain two Notices of Assessment for UC tax totaling $17,378.25. That amount included UC taxes owed as well as interest and penalties for calendar years 2011 through 2015. Attain responded with Petitions for Reassessment, contending that the UC tax should not have been imposed because the individuals who worked for Attain as tutors were independent contractors rather than employees. The Department then held a hearing on the matter.

Before the Department's Hearing Examiner, Ms. Amara testified regarding the criteria the Department used in determining whether an individual is an "employee":

---

[2] (Record (R.) Item No. 9, Respondent's Exchange of Exhibits filed under cover letter dated May 11, 2015, from Arthur Selikoff, Esquire, Employer Status Questionnaires.)

3

[A]: The first thing you have to look at is remuneration, were they paid for services provided? We can clearly see they were issued checks. They're in the employer's check register. They're in the audit program cash disbursement records.

The second thing we have to look at is direction and control. And as I've already testified to, he required them to use his laptops, his computer programs, they were not allowed to deviate from that program, and in his own words, they're not allowed to pep talk.

*** 

[Q]: Any other criteria?

[A]: That's it.

(R.R. at 327a-328a.)

Megan Scott (Ms. Scott), one of the tutors who worked for Attain, testified that she was certified in Pennsylvania as an English teacher for grades 7 through 12, and tutored grades 1 through 5 in math and reading skills for Attain. Regarding what occurred at a regular tutoring session, Ms. Scott stated:

[A]: I would go to the school that I was supposed to go to. I'd meet another tutor there and we would set up one of the rooms. We would bring all of our materials with us, materials being the laptops and the booklets that we had made for the children to use.

Then we would gather the students and we would split them in half. Half of them would use the laptop program and the other half would be working on their reading or math packets that we brought with us.

4

> After about halfway through, we would switch them and the half that was on the computer would then be on the paper material and vice versa. We'd give them [a] snack and we'd send them home.
>
> ***
>
> [Q]: And how were the booklets – how did they come into play?
>
> [A]: Well, while the students were not using the computers, they would use the booklets. The booklets were PDF files on the computers in the office, and we would print them out. They were divided by grade level, so there would be like a third grade math booklet and a third grade reading booklet. And every student that attended had their [sic] own booklet and they would spend about half the tutoring time working on that paper material. And it was grade appropriate for each student.
>
> [Q]: So did you create those materials then?
>
> [A]: I did not personally create or find the materials to put into the booklets. The only thing that I did was print them out to bring to the schools with us or with the other tutors.

(R.R. at 340a-342a.) Ms. Scott also testified that Attain determined when and where the tutoring sessions were held, as well as the methods and materials to be used during the sessions.

Finally, Mr. Zarreii himself testified as follows regarding the methods Attain used in tutoring students:

> I came up with our own softwares. These are not computers we gave to tutors to use. Those are our computers. I teach them what I need to teach them

5

> within our own programs which are customized for our use, and all we need the tutors for is to encourage kids, have the human interaction and ensure that the kids want to come back and they will go on these computers in a timely manner.
>
> Only thing we measured was, attendance of the kids, attendance of the tutors and progress of the kids on the computers. Tutors have very little knowledge. As a matter of fact, very few people have extensive knowledge of what it is that we do on a computer except the Department of Ed[ucation]. I had to disclose to them what our methods are.

(R.R. at 395a.) Mr. Zarreii also asserted that tutors who wished to bring their own materials for the children to use could do so:

> A lot of them would bring in – we gave them also a crate full of these manipulatives, and they use it as they want. Their job is psyche control of a child. Their job was to be able to read and see how much pain and suffering they're exerting on a child and make sure it's not going too far.

(R.R. at 403a.) Furthermore, Mr. Zarreii testified that Attain does not "particularly care about the method of teaching," so long as children continue to come back. (R.R. at 406a.) Regarding the non-compete clause in the subcontractor agreements the tutors were required to sign, Mr. Zarreii noted that, physically, it was not possible for a tutor to work both for Attain and a competitor because after-school tutoring sessions would occur at the same time no matter the program.

Based on the record made before the Hearing Examiner, the Secretary of Labor and Industry issued a Final Decision and Order finding that Attain failed

to meet its burden of proof demonstrating that the tutors were independent contractors rather than employees under Section 4(l)(2)(B) of the Law and, therefore, denying Attain's Petitions for Reassessment.[3]   In that decision, the Secretary made the following pertinent findings:

> 9.   [Attain] would assign tutors to particular schools/locations.
>
> ***
>
> 13. [Attain's] system used computers and customized software.  [Attain] issued these computers to the schools for the students' use.  These laptops would be stored at the schools, and were [Attain's] property.
>
> 14. [Attain's] system required students to rotate between using computers and booklets.  Half of the students would use the laptop computers, while the other half would be working on the reading and math packets that the tutors brought with them.  These tutors would switch the students between working on the computer and working on the booklets/packets halfway through the session.
>
> ***
>
> 19. Ms. Scott [one of the tutors] received direction from her supervisor . . . and later Mr. Zarreii, about printing booklets; she neither selected what materials were used nor participated in their preparation.

---

[3] The Secretary denied Attain's Petitions for Reassessment except for the amounts of payments that were made by Attain to Mr. Zarreii for personal loans he had made to Attain, as well as certain other repayments for which OUCTS withdrew its assessments in its post-hearing brief.

20. [The supervisor] would inform Ms. Scott what to put into each bin that the tutors took to the schools.

21. Ms. Scott would plug in and turn on the laptop computers at the schools, but had nothing to do with the computer program itself at the tutoring session, and did not work with students on the computers.

\*\*\*

23. Ms. Scott did not bring her own materials to the tutoring sessions; rather, tutors were provided with materials.

24. Ms. Scott did not develop a curriculum for the students she tutored.

\*\*\*

31. The tutors' role was to provide human interaction and encouragement to ensure that the students return and use the computers in a timely manner.

\*\*\*

34. Tutors were not allowed to deviate from the computer program or give pep talks.[4]

(R.R. at 588a-592a.) (citations omitted). This petition for review followed.[5]

---

[4] In finding that the tutors were not allowed to deviate from the computer program or give pep talks, the Secretary gave more weight to Ms. Amara's testimony than Mr. Zarreii's testimony to the contrary. As we state in this decision, it is within the Department's discretion to make this sort of determination.

[5] This Court's review is limited to a determination of whether constitutional rights were violated, errors of law were committed, or essential findings of fact were not supported by substantial evidence. *Lee Hospital v. Unemployment Compensation Board of Review*, 637 A.2d 695, 697 (Pa. Cmwlth. 1994).

## II.

Attain contends that the Secretary lacked substantial evidence to arrive at the legal conclusion that the tutors were employees under Section 4(l)(2)(B) of the Law rather than independent contractors. However, because Attain fails to challenge any specific findings, those findings are conclusive on appeal and we will determine whether, based on those findings of fact, Attain established that the tutors were independent contractors. *Salamak v. Unemployment Compensation Board of Review*, 497 A.2d 951, 954 (Pa. Cmwlth. 1985).

## A.

Under Section 4(l)(2)(B) of the Law, "Employment" is defined, in pertinent part, as:

> Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that – (a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(l)(2)(B). If both factors are satisfied – an individual is free from control and is customarily engaged in his/her own trade, occupation, profession or business – an individual will be found to be an independent contractor and an employer is not liable to pay UC taxes on an individual as he/she is not covered

under the Law. *Applied Measurement Professionals, Inc. v. Unemployment Compensation Board of Review*, 844 A.2d 632 (Pa. Cmwlth. 2004).

Once the Department shows that an individual is performing services for wages, the burden shifts to the employer to show that the individual is an independent contractor rather than an employee. *Cameron v. Department of Labor and Industry*, 699 A.2d 843 (Pa. Cmwlth. 1997). Because the tutors here were paid remuneration by Attain for their services, the only question is whether Attain overcame that presumption.

**B.**

The presumption that an individual who performs services for wages is an employee rather than an independent contractor may be overcome if an employer can show that an individual was free from the employer's control or direction in the performance of the employee's work. *Krum v. Unemployment Compensation Board of Review*, 689 A.2d 330, 332 (Pa. Cmwlth. 1997). To prevail, an employer must prove: (i) the individual performed his job free from the employer's control and direction, and (ii) the individual, operating as an independent tradesman, professional or businessman, did or could perform the work for others, not just the employer. *Kurbatov v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 29 A.3d 66, 69 (Pa. Cmwlth. 2011).

**1.**

As to the first prong of the test of whether the employer exercised control, the actual working relationship between employer and employee determines whether this element is satisfied. *Id.* In analyzing the issue of control, the following factors are considered:

> [W]hether there was a fixed rate of remuneration; whether taxes were withheld from the claimant's pay; whether the employer supplied the tools necessary to carry out the services; whether the employer provided on-the-job training; whether the employer set the time and location for work; and whether the employer had the right to monitor the claimant's work and review performance.

*Quality Care Options v. Unemployment Compensation Board of Review*, 57 A.3d 655, 660 (Pa. Cmwlth. 2012) (citing *Resource Staffing, Inc. v. Unemployment Compensation Board of Review*, 995 A.2d 887 (Pa. Cmwlth. 2010)). Because no single factor determines if the requisite control exists, whether the putative employer has exercised the requisite control over the worker must be based upon a totality of the circumstances. *Pasour v. Unemployment Compensation Board of Review*, 54 A.3d 134 (Pa. Cmwlth. 2012).

Even where, as here, the worker signed a subcontractor agreement and employer did not take taxes out of the worker's pay, these facts are not dispositive. It is not enough that the individual has signed a subcontractor agreement to show that the individual is exempt from coverage under the Law, as this may simply be an employer's attempt to avoid paying the UC tax. *C.A. Wright Plumbing Co. v.*

11

*Unemployment Compensation Board of Review*, 293 A.2d 126, 128 (Pa. Cmwlth. 1972).

Attain asserts that the Secretary erred in determining that it had not overcome the presumption that the tutors were employees because the Department did not consider the totality of the circumstances in coming to the conclusion that Attain exhibited control over its tutors. Specifically, Attain contends that the Secretary failed to take into consideration Mr. Zarreii's testimony that the tutors had complete control to teach the students any way they wished.[6]

In fact, the Secretary did take into consideration Mr. Zarreii's testimony but simply did not accept it, stating:

> Mr. Zarreii's contrary testimony that the tutors had "complete freedom of doing their own thing . . ." has not been accepted. [(R.R. at 402a)]. While Mr. Zarreii was very passionate about [Attain's] mission, he appeared to be less knowledgeable about many of the details

---

[6] Specifically, Mr. Zarreii testified:

> They have complete freedom of doing their own thing, but they won't do it. The teachers, you tell them that you have to bring your stuff but they won't want to bring it. They always had the excuse, I forgot, I didn't copy. We have all of these resources.

> ***

> The good ones would bring their own, but not all of them. A lot of them just wanted to walk in and get paid.

(R.R. at 402a.)

underlying an audit of this type, professing on cross examination that he was not the accountant or supposed to be the accountant. Indeed, he expressed the belief that individuals working inside of [Attain's] place of business were employees, whereas individuals working in the field were independent contractors.

(R.R. at 602a.)

Moreover, based on his findings of fact, the Secretary went on to say:

The record fundamentally demonstrates actual control by [Attain] over the tutors. Specifically, we have credited [Ms. Amara's] testimony, based on Mr. Zarreii's admissions, that tutors were not allowed to deviate from the computer program or give pep talks. . . . [Attain] required prospective tutors to take a psychological test to ensure that they were suited to its expectations. . . . Ms. Scott testified that she received direction from [Attain] about printing booklets, and what to place in bins for tutors to take to the schools. . . . Moreover, [Attain's] system required students to rotate between using computers and booklets. . . .

***

The tutors use materials developed by [Attain]. . . . Their very participation in this program, working with another tutor, and using [Attain's] system to rotate students between computers and booklets . . . exhibits actual control by [Attain] over the manner of their work.

(R.R. at 601a-602a.) (citations omitted).

13

The Secretary then conducted a careful weighing of the specific factors relating to control that he considered in coming to his conclusion:

> The more recent *Quality Care/Resource Staffing* factors . . . fail to produce clear direction sufficient to dislodge our conclusion of actual control. The record appears to be silent regarding the rates of remuneration for the individuals reclassified by OUCTS. Accordingly, this factor must be viewed as ambiguous, which means it weighs in favor of neither an employment nor an independent-contractor relationship. [*Robinson v. Department of Labor and Industry* (Pa. Cmwlth., No. 1711 C.D. 2015, filed March 31, 2016).]
>
> [Attain] paid the disputed individuals either through a 1099, or without issuing them either a 1099 or a W-2. This evidence supports an inference that [Attain] did not withhold taxes from their pay. On the other hand, [Attain] supplied the tools necessary for the tutoring sessions; namely the computers, the customized software, and the booklets used by the tutors.
>
> [Attain] does not conduct regular training for the tutors. This factor thus favors [Attain]. The times for the tutoring sessions were set by the school districts, as opposed to either [Attain] or the tutors. However, the very nature of after-school tutoring sessions basically dictates the times they are held. Accordingly, the time portion of this factor is neutral. The nature of after-school tutoring also affects the location of the sessions. Nevertheless, [Attain] assigned tutors to particular schools/locations, thereby nudging the location part of this factor towards control.
>
> [Attain] did not measure its tutors, except for attendance. The absence of tutor evaluations appears to be more a matter of [Attain's] prerogative, than a function of the tutors' independence. As Mr. Zarreii explained, "[w]hatever I have to do to teach them is done on the computer," and "[w]e don't even particularly care about the method of teaching, as long as the kids are coming

14

back and doing it there on the computer . . . ." [(R.R. at 401a, 406a.)] Nevertheless, the tutors operated under [Attain's] system that included not deviating from the computer program; not giving pep talks; ensuring that students use the computer in a timely manner; and verifying that students log onto the computers under their own names. At best, this factor is ambiguous under the circumstance of the present case.

The last *Quality Care/Resource Staffing* factor is whether the employee was expected to attend regular meetings. Mr. Zarreii testified that [Attain] did not have regular meetings for the tutors.

A plurality (three to be exact) of the *Quality Care/Resource Staffing* factors favor [Attain]. Nonetheless, a majority of them (four) are either ambiguous/neutral or favor OUCTS. This lack of a majority in [Attain's] favor, coupled with evidence reflecting actual control by [Attain], forestalls any possible conclusion that [Attain] has met its burden by establishing the tutors to be free of direction and control under Section [4(l)(2)(B)'s] first prong.

(R.R. at 602a-604a.) (citations omitted).

Because the Secretary clearly considered the totality of the circumstances in arriving at his determination, and we agree with his analysis, we also agree that Attain exercised control over its tutors.

**2.**

Not only did Attain fail to show that it did not exercise control over the tutors, it also did not meet the second prong of the test that the tutors customarily engaged in their work as an independently established trade,

15

occupation, profession or business. Our Supreme Court established three factors to analyze whether a worker satisfies this test under Section 4(l)(2)(B):

> (1) whether the individuals are able to work for more than one entity; (2) whether the individuals depended on the existence of the presumed employer for ongoing work; and (3) whether the individuals were hired on a job-to-job basis and could refuse any assignment.

*Gill v. Department of Labor and Industry*, 26 A.3d 567, 570 (Pa. Cmwlth. 2011) (citing *Danielle Viktor, Ltd. v. Department of Labor and Industry*, 892 A.2d 781, 797-98 (Pa. 2006)).

Regarding the first factor, the Secretary found that Attain required its tutors to sign a non-compete agreement prohibiting them from working for a competitor during the time they worked for Attain and for 90 days thereafter. While such non-compete clauses are not dispositive in a Section 4(l)(2)(B) analysis, because they limited the tutors' ability to seek work with companies similar to Attain, they are an important consideration, particularly when they foreclosed employment after the individuals no longer worked as tutors for Attain. *See SkyHawke Technologies, LLC v. Unemployment Compensation Board of Review*, 27 A.3d 1050, 1058 (Pa. Cmwlth. 2011).

Furthermore, the existence of the non-compete agreement goes to the second *Viktor* factor – whether or not the tutors depended upon Attain for work. The focus of this factor is not whether the worker is dependent upon the presumed employer for all types of work but, rather, whether the worker depends on the

presumed employer for ongoing work within the same field. *See Robinson v. Department of Labor and Industry* (Pa. Cmwlth., No. 1711 C.D. 2015, filed March 31, 2016), slip op. at 33 (stating that the relevant inquiry as to whether the workers depended on the presumed employer for work must pertain to work within the same field). Because the non-compete agreements prevented the tutors from being able to work for more than one entity in Attain's line of business, it follows that the tutors were dependent upon Attain for work within the same field.

As to the third factor, the freedom to accept or reject assignments from the alleged employer is an important factor with respect to whether the individuals were hired on a job-to-job basis. *See Stauffer v. Unemployment Compensation Board of Review*, 74 A.3d 398, 405 (Pa. Cmwlth. 2013). The record does not contain any evidence regarding this factor, one way or the other. Rather, the evidence shows that the tutors worked wherever and whenever Attain dictated, and Attain's contracts with the school districts typically ran from November until April or May. The Secretary noted that this suggests an ongoing work relationship by the tutors. Because there is no record evidence to suggest that the tutors were free to reject work or were hired on a job-to-job basis, and because Attain had the burden of proof, we agree with the Secretary that, at best, this is a neutral factor.

This Court supplemented the *Viktor* factors in *Minelli v. Unemployment Compensation Board of Review*, 39 A.3d 593, 598 (Pa. Cmwlth. 2012), when we found that it is also relevant whether the worker was engaged in an "independently established trade, occupation, profession or business." The

worker must be "*customarily* engaged in such trade or business in order to be considered self-employed." *Id.* (emphasis in original).

In response to Ms. Amara's questionnaires, most of the tutors stated that they did not own or operate their own business. Attain presented no evidence that the tutors were customarily engaged in an independently established trade, occupation, profession or business. On the contrary, Mr. Zarreii testified that many of the tutors "just wanted to walk in and get paid." (R.R. at 402a.) Furthermore, it was not a condition of the job that the tutors have teaching certifications. Therefore, under the *Viktor* factors, the tutors were not customarily engaged in an independently established business.

Because Attain exercised control over the tutors' performance and because the tutors were not customarily engaged in an independently established business, Attain failed to meet its burden of showing that the tutors were independent contractors under Section 4(l)(2)(B) of the Law. Accordingly, we affirm.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Attain Learning Center, LLC, :
                Petitioner :
  :
        v. : No. 735 C.D. 2017
  :
Department of Labor and Industry, :
Office of Unemployment :
Compensation Tax Services, :
             Respondent :

# **O R D E R**

AND NOW, this 9th day of May, 2018, the Secretary of Labor and Industry's final decision and order dated February 23, 2017, is affirmed.

_____
DAN PELLEGRINI, Senior Judge